740 P.2d 1022

**TUSCH ENTERPRISES, a partnership consisting of Earl F. and Marianne Tusch, husband and wife; Carl W. Tusch, Sr. and E. Norene Tusch, husband and wife; Carl W. Tusch, Jr. a single person, Plaintiffs-Counterdefendants Appellants,**

v.

**Rex T. COFFIN, Defendant-Cross Claimant, Cross Defendant-Respondent,**

and

**Robert Vander Boegh and Elizabeth Vander Boegh, husband and wife, Cross Defendants-Counter-claimants, Cross-claimants-Respondents.**

No. 16380.

Supreme Court of Idaho.

July 2, 1987.

**38**

Robert O. Eldredge of Lyon & Jorgensen, Pocatello, for Tusch Enterprises.

George A. Southworth of Herzog & Roche, Pocatello, for Coffin.

Gaylen L. Box of McDermott, Zollinger, Box & Olley, Pocatello, for Vander Boeghs.

DONALDSON, Justice.

Tusch Enterprises appeals from an order of the district court granting summary judgment in favor of Robert and Elizabeth Vander Boegh, husband and wife, and Rex T. Coffin. Tusch Enterprises brought this action after discovering that residential duplexes it had recently purchased suffered from major structural infirmities. The complaint advanced the following theories of recovery: (1) negligence, (2) misrepresentation, (3) express warranty, and (4) implied warranty of habitability. We reverse the entry of summary judgment as to the misrepresentation and implied warranty of habitability counts.

### I

#### Facts

We present the facts in the light most favorable to Tusch Enterprises. Robert Vander Boegh, a man with considerable experience in the road construction business, and his wife owned land in Pocatello, Idaho, and decided to build three duplexes. The rolling foothill upon which the duplexes were to be built was levelled for construction by Bengal Construction. The Vander Boeghs then contracted with Rex Coffin, a building contractor, to erect the duplexes. Pursuant to their agreement, Coffin was to prepare plans for the duplexes, secure all the necessary building permits, and build the structures. The site preparation and the outside work, such as gutters, lawns, curbs, and grading, were

left to Robert Vander Boegh *to do, or to contract out.*

Coffin began working on the site in the fall of 1975. In his deposition, he describes some difficulties he encountered in securing a permit:

"Q. Did you have questions in your mind at that time whether or not it was a suitable site for constructing duplexes on?

"A. When I talked to the city, they were quite reluctant, I'll say, they seemed to have a grudge against Bob [Vander Boegh]. And so I talked to Bob and asked him about it, and I said, 'Are we looking at any fill?' And he said, 'No, this is all cut.' And I took the message back to them, because it was all cut out of the mountainside there. And I discussed that with Mr. Mason and those fellows, and after quite a hassle we got the permit."

Throughout his deposition, Coffin testifies that Robert Vander Boegh told him the site had been cut from the mountain, and that no fill dirt had been used. The presence of fill dirt is significant because it tends to compact more and is thus more likely to cause foundations to settle and crack. During construction, Coffin became concerned enough about the "softness" of the soil where the south duplex was to be built that he asked a building inspector to investigate. Coffin testifies that the softness was brought to Vander Boegh's attention:

"A. ... And what brought it up was there was a little indication of a little softness there, and so we started digging to make sure that there was not anything that would indicate fill or anything like that....

"Q. You mentioned a conversation with Bob [Vander Boegh] regarding this problem. What was that?

"A. Well, when we dug down, Bob and I talked it over, and I showed him where we were. We talked it over as owner and contractor and we decided that this would be. And I

wanted his professional opinion, too, on it.

"Q. Now, what exactly was the content of the conversation?

"A. Well, we were just looking the job over and passing the time of day and I told him about this little area there that I had to question. And I went way beyond the ordinary to make sure that it was proper and right."

Robert Vander Boegh testifies in his deposition as to his version of the conversation regarding soft soil at the south duplex site:

"A. Yes. On one weekend Rex had called me up and wanted me to meet—I lived right next door, and if I remember correctly he had the footings constructed for the two duplexes. Now, on the third one in question, [the south unit,] he had that all excavated and on the far end that settled he was down, I'd say, two feet further than he normally would have had to go, and he said it looked to him like there was some question if he was down to original ground, and I agreed with him, that it didn't look original to me. And this is hard to tell. So I told Rex to do whatever he had to do to get the footings down, and he volunteered that he would dig it by hand just as far as he had to go to put that footing in.

"Q. *As I understand what you are saying, that you indicated to him it does look like there is fill, do what you have to do to take care of it?*

"A. *That's correct.*"

In early 1976, after the duplexes were completed, the Vander Boeghs began renting out the duplex apartments. Later, they listed the properties for sale with a realtor. Marianne Tusch learned of the listing at the agency where she worked as a real estate agent. She and a number of her relatives were interested in purchasing the duplexes as investment property. They formed a partnership, Tusch Enterprises, for that purpose.

On June 7, 1978, Tusch Enterprises offered to purchase the duplexes for $125,000. The offer was rejected. During this time period, Marianne Tusch met with Robert Vander Boegh and his realtor. In her deposition, Marianne Tusch testifies that Vander Boegh informed her he worked for a construction company, had access to site preparation equipment, and had participated in the site preparation. She also testifies that Vander Boegh stated the buildings were of "good quality construction." By affidavit, she asserts that she relied upon these representations. On June 15, 1978, a second offer of about $140,000 was communicated to the Vander Boeghs. Vander Boegh told Marianne Tusch that he would either accept the second offer or take the property off the market. He chose the latter.

Sometime later, the duplexes were re-listed. Tusch Enterprises became aware of this, and on March 27, 1979, submitted an offer of $140,000. The Vander Boeghs accepted this third offer, though it was substantially the same as the one they had rejected only nine months earlier.

Prior to purchasing the units, Tusch Enterprises had inspected them and noticed no major defects. However, about one month after purchasing the duplexes, Tusch Enterprises discovered from a tenant that the south unit was having problems. The walls had begun cracking around the windows and many of the doors would not close properly. Further investigation revealed that the foundation was cracking. Geotechnical and construction experts have submitted affidavits and testified by deposition of their opinion that the foundation had been partially constructed on fill dirt, which had compacted causing the foundation to settle and crack. They are of the opinion that the foundation was improperly constructed given the fill dirt conditions.

Marianne Tusch testifies in her deposition that she was not told of the fill dirt conditions, or of the possible problems with the foundation. She further testifies that one of the cracks in the south unit appeared to have been filled in, or patched, with cement. After discovering the problems with the foundation, Tusch Enterprises learned from the Vander Boeghs that Coffin had actually constructed the duplexes and attempted, without success, to discuss the problems with Coffin. Tusch Enterprises expended a great deal of money remedying the problems. The structural defects have caused damage to the duplexes themselves and to the parking lot, and have caused losses in rental income, but Tusch Enterprises has suffered no personal injuries and has suffered no damage to property other than that which was the subject of the duplex sales transaction.

Suit was filed against the Vander Boeghs and Coffin to seek compensation for these structural defects. Tusch Enterprises alleged negligence, misrepresentation, express warranty, and implied warranty and prayed for damages for loss of rental value and costs of repair. The case was before a number of district judges at different stages, and eventually summary judgment was entered against Tusch Enterprises as to all four theories of recovery.

Before addressing those decisions, we recall the standard by which motions for summary judgment are reviewed. It is our task to review the record before the court below, including the pleadings, depositions, admissions, and affidavits, if any, and to determine de novo whether, after construing the facts in the light most favorable to the nonmoving party, there exist any genuine issues of material fact and whether the successful movant below is entitled to judgment as a matter of law. *Pincock v. Pocatello Gold & Copper Mining Co., Inc.*, 100 Idaho 325, 597 P.2d 211 (1979). *See also*, I.R.C.P. 56(c).

II

**Negligence**

Tusch Enterprises alleges negligence on the part of the Vander Boeghs and Coffin in the design and construction of the duplexes. However, the only damages it alleges are lost rental income and property damage to the duplexes and the parking lot. These losses are economic:

"Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.,* 97 Idaho 348, 351, 544 P.2d 306, 309 (1975).

In *Clark v. International Harvester Co.,* 99 Idaho 326, 581 P.2d 784 (1978), we had to decide whether the purchaser of a defective product who has suffered only economic losses may recover those losses in a negligence action against the manufacturer. We ruled that purely economic losses are not recoverable in negligence. Other courts have criticized limiting the negligence theory in this manner. *See, e.g., Council of Co-Owners v. Whiting-Turner,* 308 Md. 18, 517 A.2d 336, 344–45 (1986), and the cases cited therein. These courts argue that the distinction between economic and other loss is arbitrary. However, as we explained in *Clark* with the words of Justice Traynor, in our view

"[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products. He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees [expressly or impliedly] that the product was designed to meet the consumer's demands." *Clark, supra,* 99 Idaho at 334, 581 P.2d at 792, quoting *Seely v. White Motor Co.,* 63

Cal.2d 9, 45 Cal.Rptr. 17, 23, 403 P.2d 145, 151 (1965). (Addition ours.)

"The economic expectations of parties have not traditionally been protected by the law concerning unintentional torts. [Citations.] We do not believe that any good purpose would be achieved by undermining the operation of the UCC provisions [and other contract principles] by extending tort law to embrace purely economic losses in product liability cases." *Clark, supra,* 99 Idaho at 335, 581 P.2d at 793.

We adhere to the view expressed in *Clark,* and, accordingly, affirm the decision of the court below dismissing Tusch Enterprises' negligence claims.

### III

#### Misrepresentation

In its complaint, Tusch Enterprises alleges misrepresentation on the part of Robert Vander Boegh. Tusch Enterprises directs the court's attention to *Faw v. Greenwood,* 101 Idaho 387, 613 P.2d 1338 (1980), and argues that the elements of misrepresentation outlined therein have been satisfied. The elements are as follows:

"(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance on the truth; (8) his right to rely thereon; and (9) his consequent and proximate injury." *Id.,* at 389, 613 P.2d at 1340, *quoting Mitchell v. Siqueiros,* 99 Idaho 396, 401, 582 P.2d 1074, 1079 (1978).

We do not believe Tusch Enterprises' misrepresentation claim should be analyzed only with reference to the elements recited in *Faw, supra.*[1] It must also be considered

---

1. To say that *all* fraudulent misrepresentation must fit within *Faw's* nine-element formulation misconstrues the very nature of fraud. "Fraud vitiates everything it touches. It is difficult to define; there is no absolute rule as to what facts constituted [sic] fraud; and the law does not provide one 'lest knavish ingenuity may avoid it.'" *Massey-Ferguson, Inc. v. Bent Equipment Company,* 283 F.2d 12, 15 (5th Cir.1960). "[T]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity." *Id.* The varied forms of fraud are also illustrated by the Restatement (Second) of Torts §§ 526–530, and 551 (1977).

whether the facts here fall within the category of cases finding a misrepresentation on the basis of nondisclosure.

We addressed the instances where nondisclosure may amount to misrepresentation in *Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P.2d 698 (1966). In *Bethlahmy,* the defendant, Bechtel, was the builder and vendor of a residential home. Bechtel told the plaintiffs that the houses he built were the finest, and that the house at issue was of first quality construction. However, Bechtel did not disclose to the plaintiffs that a tiled water line ran underneath the garage and to within seven or nine feet of the north wall of the residence. We explained plaintiffs' cause of action:

> "Plaintiffs commenced this action for rescission and restitution, mainly on the ground of defendants' failure to disclose the defective condition of the house. The presence of the unsealed irrigation ditch through the lot and beneath the garage, coupled with the fact that the basement was not of waterproof construction, constituted major defects, known to defendants, and unknown to plaintiffs, and not discoverable upon reasonable inspection. Failure to disclose such defects would support a finding of fraud." *Id.,* at 59, 415 P.2d at 702.

Relying upon § 551 of a tentative draft of the Restatement (Second) of Torts,[2] the court found that the plaintiffs had presented facts entitling them to relief:

> "Defendant did not testify that he called attention to, or advised plaintiffs of, the ditch running under the lot and garage; nor that the ditch was constructed of drainage tile without sealed joints; nor that the basement was not of waterproof construction. These facts were known to defendant and unknown to plaintiffs. They were not discoverable by inspection. Defendant had superior knowledge. Plaintiffs were ignorant of the facts. The parties did not deal at arms length. Defendant dealt from a position of superior knowledge. A confidential relationship arose between the parties. *Stearns v. Williams,* 72 Idaho 276, 288, 240 P.2d 833 (1952). Plaintiffs relied, and were entitled to rely, upon defendant's representation that the house would be a quality home. The facts essential to a finding of constructive fraud ... are not in dispute." *Id.,* at 62, 415 P.2d at 705.

The rationale for recognizing such a cause of action was explained in *Bethlahmy* with the following quotation from *Kaze v. Compton,* 283 S.W.2d 204, 207 (Ky. 1955):

> "It cannot be controverted that actionable fraud or misrepresentation by a vendor may be by concealment or failure to disclose a hidden condition or a material fact, where under the circumstances there was an obligation to disclose it during the transaction. If deception is accomplished, the form of the deceit is immaterial. And the legal question is not affected by the absence of an intent to deceive, for the element of intent, whether good or bad, is only important as it may affect the moral character of the representation." *Bethlahmy, supra,* 91 Idaho at 60, 415 P.2d at 703.

---

2. The tentative draft provision relied upon in *Bethlahmy* was adopted after only minor cosmetic changes. Restatement (Second) of Torts § 551 (1977) provides in pertinent part:

**"§ 551. Liability for Nondisclosure**

"(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

"(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

"(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

"(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

" ...

"(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts."

*Kaze v. Compton* explained that actual intent to deceive need not be shown where the seller knew of facts which would have apprised a person of ordinary prudence of the truth: if a reasonable person would have been so apprised, and the seller was under a duty to inform the buyer of the concealed facts, then intent to deceive is not necessary to make a prima facie showing. *Kaze, supra,* at 208.

▮ After his conversation with Coffin, Vander Boegh knew, or should have known, that the south duplex was, at least partially, built upon fill dirt. A person of ordinary prudence with a background similar to Vander Boegh's (*e.g.,* with extensive road construction experience and knowledge of compaction), who knew of the fill dirt would have been apprised of the truth (*e.g.,* that problems with the foundation were likely). Yet, by Tusch Enterprises' account, Vander Boegh did not disclose the fill dirt problems, and, instead, assured Marianne Tusch that the duplexes were quality dwellings. The soil problem, like the ditch in *Bethlahmy,* was not a patent defect. Finally, although it may be proven that Tusch Enterprises has greater expertise than the average home buyer when it comes to evaluating homes, because this case is before us from an order granting summary judgment, we must assume that, like the buyers in *Bethlahmy,* Tusch Enterprises did not deal with Vander Boegh at arms' length and was entitled to rely upon his representation that the dwellings were well-constructed.

We hold that it was error to dispose of Tusch Enterprises' misrepresentation claim against the Vander Boeghs at the summary judgment stage. Genuine issues of material fact exist whether the nondisclosure of the soil problems, coupled with the assurance that the duplexes were quality constructed, amounted to a misrepresentation. *See* Restatement (Second) of Torts § 551(2)(a), (b) and (e). Our holding here is not affected by the parol evidence rule. *See* n. 5, *infra.*

## IV

### Express Warranty

▮ Tusch Enterprises alleges that the Vander Boeghs and Coffin breached an express warranty to the effect that the duplexes were well-constructed. Regarding Coffin, Tusch Enterprises readily admits that it did not know of Coffin until after it had purchased the duplexes and problems had become evident. There being nothing in the record to show that Coffin made any warranties to the Vander Boeghs or had any discussions with Tusch Enterprises, we affirm the dismissal of the express warranty claim against Coffin. With regard to the Vander Boeghs, the facts alleged in support of an express warranty are essentially those discussed in the preceding section under misrepresentation. Tusch Enterprises argues that these representations of quality construction became part of the bargain. However, we find that the parol evidence rule precludes Tusch Enterprises from making such an assertion and, accordingly, affirm the decision below dismissing the express warranty claim against the Vander Boeghs.

Before further addressing the applicability of the parol evidence rule, it is necessary to supplement the facts previously recited. When the third offer was accepted by the Vander Boeghs, they and Tusch Enterprises signed an earnest money agreement. This written document was prepared by Marianne Tusch, and included the following language with which she had become familiar through her employment with a real estate agency:

"The undersigned Buyer hereby acknowledges further that he has not received or relied upon any statements or representation by the undersigned broker or his representatives or by the Seller which are not herein expressed. The Buyer has entered into this agreement relying solely upon information and knowledge obtained from his own investigation or personal inspection of the premises. This agreement constitutes the whole agreement between the parties and no warranties, agreements or representations have been made or shall be binding upon either party unless herein set forth."

A short time after executing the earnest money agreement, the parties entered into a written real estate contract, which was

prepared by the Vander Boeghs. This contract provided that it incorporated the terms and conditions of the earnest money agreement, except as modified by the real estate contract. The portions of the real estate contract pertinent to the present inquiry are as follows:

"12. EXCLUSIVE TERMS: This contract is the entire agreement between the parties and all other agreements heretofore entered into, either written or oral, are hereby either abrogated or contained in this agreement. All prior oral agreements and conditions are expressly waived unless stated in this agreement and the parties expressly understand they have no mutual understanding or agreement other than as herein set forth.

"13. WARRANTIES: The Purchasers have fully inspected the above described premises and know just exactly what they are purchasing. Sellers warrant that they have a good and sufficient title, and that the premises have no code violations or governmental restrictions as of May 15, 1979, and that further as of May 15, 1979, Sellers warrant that they know of no defects in the sewers, plumbing, electrical items, and mechanical items in and about the property. Other than as set forth in this paragraph, Sellers make no further warranties with regard to the condition of the sewer lines, utility poles, fences, curbs, sidewalks, streets, patios or any other mechanical item of any description whatsoever within the described premises."

The features of the parol evidence rule are aptly stated in *Chapman v. Haney Seed Co., Inc.*, 102 Idaho 26, 624 P.2d 408 (1981):

"It is the general rule that when a contract has been reduced to writing, which the parties intend to be a complete statement of their agreement, any other written or oral agreements or understandings (referred to in many cases as extrinsic evidence) made prior to or contemporaneously with the written 'contract' and which relate to the same subject matter are not admissible to vary, contradict or enlarge the terms of the written contract." *Id.*, at 28, 624 P.2d at 410.

A "merger" clause [3] in a written agreement is one means of proving that the writing was intended as a complete statement of the parties' agreement. *Tapper Chevrolet Co. v. Hansen*, 95 Idaho 436, 439, 510 P.2d 1091, 1094 (1973).

The merger clauses here are similar to the merger clause in *Tapper Chevrolet.*[4] They unequivocally state that there are no terms, understandings or agreements other than those which are expressed by the parties' written contract. Not insignificantly, Tusch Enterprises supplied the earnest money agreement and the merger clause contained therein. In addition, the real estate contract, unlike the earnest money agreement, was not a form agreement. Rather, it was a type-written document, tailored to the duplex sales transaction; and the record reflects that Tusch Enterprises objected to certain terms and was able to have them changed to its liking. Further, the merger clause of the real estate contract is not mere boiler plate: it, like the rest of the contract, was tailored to the duplex sales transaction.

 From these facts, it is apparent that the parties intended the real estate contract, and the earnest money agreement by incorporation, to be a complete and exclusive statement of the terms of their agreement. The evidence proffered by Tusch Enterprises to the effect that the Vander Boeghs, prior to execution of these agreements, warranted that the duplexes were well-constructed is evidence that

---

**3.** A merger clause has been defined as "[a] provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document. *See* U.C.C. § 2-202." *Black's Law Dictionary*, 892 (5th ed. 1979).

**4.** The merger clause in *Tapper Chevrolet* provided that "all understandings and agreements heretofore had ... are merged in this Agreement, ... neither party relying upon any statement or representation not embodied in this agreement, made by the other." 95 Idaho at 439, 510 P.2d at 1094.

would vary, contradict or enlarge the terms of the written contract. Thus, under the parol evidence rule, this evidence was properly excluded, and the express warranty count against the Vander Boeghs was properly dismissed.[5]

## V

### Implied Warranty

The final theory of recovery which we need address is implied warranty of habitability. Tusch Enterprises alleges a breach on the part of both Coffin and the Vander Boeghs. First, the Court will examine whether the integrated writings of the parties preclude the implied warranty of habitability. Next, we will address the issue whether the implied warranty of habitability extends to dwellings purchased for income-producing purposes which have never been occupied by the buyers. Then, we will determine if genuine issues of material fact exist as to whether the Vander Boeghs may have been builders or builder-developers and, thus, warrantors of habitability; and, if so, whether issues of material fact exist as to a breach of that warranty. Finally, we have to determine if genuine issues of material fact exist as to whether

Coffin may have been a builder and, thus, a warrantor of habitability; and, if so, whether the implied warranty of habitability would extend to subsequent purchasers.

### A. DISCLAIMERS

As noted in the preceding section, the integrated agreement of the parties purports to set forth all the warranties which attached to the duplexes. However, the warranty of habitability is not specifically mentioned or disclaimed in either the earnest money agreement or the real estate contract.

■ The majority of states permit a disclaimer of an implied warranty of habitability, but the disclaimer must be clear and unambiguous and such disclaimers are strictly construed against the builder-vendor. *Belt v. Spencer,* 41 Colo.App. 227, 585 P.2d 922, 925 (1978); *Bridges v. Ferrell,* 685 P.2d 409, 411 (Okla.Ct.App.1984); *Crowder v. Vandendeale,* 564 S.W.2d 879 (Mo.1978) (en banc). We agree with these courts and particularly with the Missouri Supreme Court:

"[O]ne seeking the benefit of such a disclaimer must not only show a conspicuous provision which fully discloses the

---

**5.** It may appear odd that we did not address the parties' merger clauses in our discussion above of misrepresentation, especially since Tusch Enterprises advances the same facts in support of both express warranty and misrepresentation, and since the merger clauses, when read together, provide that the buyer has relied upon no representations other than those expressed in the two written agreements. The parol evidence rule, however, does not apply to averments of fraud, misrepresentation, mutual mistake or other matters which render a contract void or voidable. *See* 3 Corbin on Contracts § 580 (1960); and Restatement (Second) of Contracts § 214 (1981) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish ... (d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause; (e) ground for granting rescission, reformation, specific performance, or other remedy.").

Further, the applicability of the parol evidence rule is not affected by the fact that Tusch Enterprises does not seek rescission as its remedy for misrepresentation:

"Fraud is not an exception to the parol evidence rule. Since the application of the

rule is predicated upon a validly formed contract, any evidence should be permitted that shows a defect of formation. Yet the remedies available to the defrauded party extend beyond those logically resulting from the rationale that no contract existed. Ignoring for the moment actions for damages, it is clear that the defrauded party in some situations has been allowed a remedy amounting to enforcement of the promise. This can be justified by regarding the establishment of fraud as opening up a flexible set of remedies. The remedy need not be restricted to one that is consistent with the method by which the evidence is admitted. In other words, the stress must be upon promissory fraud as a cause of action, rather than as a minor aspect of the total picture of the parol evidence rule. If this is recognized, then a remedy should be given that fits the circumstances, even if it means enforcement of the false promise." Sweet, "Promissory Fraud and the Parol Evidence Rule," 49 Cal.L.Rev. 877, 903–04 (1961) (footnotes omitted).

This notion of providing flexible remedies for fraud is also found in our Uniform Commercial Code, I.C. § 28-2-721 (1980), and the Restatement (Second) of Torts § 549 (1977).

consequences of its inclusion but also that such was *in fact* the agreement reached. The heavy burden thus placed upon the builder is completely justified, for by his assertion of the disclaimer he is seeking to show that the buyer has relinquished protection afforded him by public policy. A knowing waiver of this protection will not be readily implied." *Crowder, supra,* at 881 n. 4 (emphasis in original).

The Court explains its approach: "By this approach, boilerplate clauses, however worded, are rendered ineffective, thereby affording the consumer the desired protection without denying enforcement of what is in fact the intention of both parties." *Id.,* at 881. *Accord Petersen v. Hubschman Construction Co., Inc.,* 76 Ill.2d 31, 27 Ill.Dec. 746, 751, 389 N.E.2d 1154, 1159 (1979).

 The disclaimers in the instant case fall woefully short of fulfilling these requirements. Because the implied warranty of habitability is a creature of public policy, public policy dictates that it be waived only with difficulty. The party asserting that it has been waived bears the burden of proving that it has been *knowingly* waived. Clearly, when no mention is made of the implied warranty of habitability in a contract, and the contract contains only general language stating there are no warranties other than those contained within its four corners, any purported waiver of the implied warranty of habitability is ineffective.

Because we find that the implied warranty of habitability has not been disclaimed, we proceed to the next topic.

## B. BUYERS

Next, we consider whether the implied warranty of habitability extends only to buyers who reside in dwellings after they are purchased. The uncontroverted facts show that Tusch Enterprises purchased the duplexes at issue for income-producing purposes and, rather than residing in them, has leased them to others. The Vander Boeghs and Coffin argue that these facts entitle them to judgment as a matter of law. We disagree.

Defendants cite an opinion of the Illinois Appellate Court, *Hopkins v. Hartman,* 101 Ill.App.3d 260, 56 Ill.Dec. 791, 427 N.E.2d 1337 (1981), as persuasive authority. The court there held that the implied warranty of habitability does not extend to duplexes purchased solely for income-producing purposes and never occupied by the owners. The court reasoned that the warranty runs only to "the relatively unsophisticated buyer, making a large investment, in a structure to be used by him as a residence." *Id.,* 56 Ill.Dec. at 793, 427 N.E.2d at 1339. Those who buy dwellings with the motive of producing income, it is advanced, do not fall within the class of persons protected by the implied warranty because the warranty "was intended to protect a consumer, not an investor." *Id.*

We refuse to restrict the implied warranty of habitability to buyers who personally reside in dwellings after they are purchased. It is of no matter *who* ultimately inhabits the home after purchase, be it the buyer, a relative or lessee. The implied warranty is that the *structure* will be fit for habitation, and resolution of the question whether the buyer has received that which he bargained for does not depend upon the status of the buyer or ultimate user; it depends upon the quality of the dwelling delivered and the expectations of the parties. In transactions in goods, our Uniform Commercial Code implies warranties of merchantability and fitness for a particular purpose when certain circumstances are present. *See* I.C. §§ 28-2-314 and 28-2-315 (1980). Yet, the UCC does not distinguish, as *Hopkins* does with sales of homes, between buyers who seek income through the use of purchased goods and buyers who merely acquire them for personal use. The focus must be upon the product, be it a typewriter or a home, and not upon the buyer. We see no reason for following *Hopkins'* consumer/investor distinction when the net effect would be to afford more protection to purchasers of chattels than purchasers of residential dwellings.

Further, *Hopkins'* suggestion that investor-buyers can easily hire experts to evaluate dwellings prior to their purchase is impractical. The implied warranty of habitability only extends to latent defects manifesting themselves after purchase. It is unrealistic to expect buyers to consult geotechnical and other experts about defects that are not even apparent.[6] In addition, as noted in our discussion below of the implied warranty count against the Vander Boeghs, we are mindful that it is the builder or builder-developer whose conduct has created the latent defect, and it is the builder or builder-developer who is in the better position to guard against and remedy such defects, or, at the least, disclose them.

Therefore, we hold that the implied warranty of habitability extends to residential dwellings purchased for income-producing purposes which have never been occupied by the buyers.

## C. VANDER BOEGHS

The court below granted summary judgment in favor of the Vander Boeghs on Tusch Enterprises' implied warranty of habitability count.

In *Bethlahmy, supra,* we recognized that when builder-vendors sell newly constructed buildings there is an implied warranty that the buildings will be habitable. Our rejection of the doctrine of *caveat emptor* as applied to the sale of new houses is consistent with the vast weight of authority. *See, e.g., Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 416, 441 N.E.2d 324, 329 (1982), and the cases cited therein. The trend away from the doctrine of *caveat emptor* in transactions of this nature is rooted in considerations of public policy:

"The mores of the day have changed and the ordinary home buyer is not in a position to discover hidden defects in a structure. A home buyer should be able to place reliance on the builder or developer who sells him a new home, the purchase of which in so many instances, is the largest single purchase a family makes in a lifetime. Courts will judicially protect the victims of shoddy workmanship. Consumer protection demands that those who buy homes are entitled to rely on the skill of the builder and that the house is constructed so as to be reasonably fit for its intended use. The average purchaser is without adequate knowledge or opportunity to make a meaningful inspection of the component parts of a residential structure." *Moxley v. Laramie Builders, Inc.,* 600 P.2d 733, 735 (Wyo. 1979) (footnote omitted).

Economic policy considerations come into play as well:

"[B]y virtue of superior knowledge, skill, and experience in the construction of houses, a builder-vendor is generally better positioned than the purchaser to know whether a house is suitable for habitation. He also is better positioned to evaluate and guard against the financial risk posed by a [latent defect], and to absorb and spread across the market of home purchasers the loss therefrom. In terms of risk distribution analysis, he is the preferred or 'least cost' risk bearer. Finally, he is in a superior position to develop or utilize technology to prevent such defects: and as one commentator has noted, 'the major pockets of strict liability in the law' derived from 'cases where the potential victims ... are not in a good position to make adjustments that might in the long run reduce or eliminate

---

**6.** The sophistication or expertise of the buyer, if any, bears only upon whether he knew or should have known of defects at the time of purchase:

"Is the purchaser to be held to the standard of inspection by the construction expert, or by the typical relatively uninformed home buyer whose observation and perception is limited to the externals? Certainly the buyer should be held at least to the standard of competence and skill which he in fact possesses; other-

wise, it seems appropriate to hold the purchaser only to that knowledge which an inspection by the proverbial reasonable non-expert would disclose. It is wholly impractical for the typical middle-class homebuyer to *employ a series of experts in various aspects of construction to examine his prospective purchase."*
Haskell, "The Case for an Implied Warranty of Quality in Sales of Real Property," 53 Georgetown L.J. 633, 651 (1965).

the risk.' R. Posner, Economic Analysis of Law 140–41 (2d ed. 1977)." *Gaito v. Auman*, 70 N.C.App. 21, 318 S.E.2d 555, 559 (1984), *aff'd*, 313 N.C. 243, 327 S.E.2d 870 (1985).

■ Further, the implied warranty of habitability is not limited to builder-developers:

> "We can see no difference between a builder or contractor who undertakes construction of a home and a builder-developer. To the buyer of a home the same considerations are present, no matter whether a builder constructs a residence on the land of the owner or whether the builder constructs a habitation on land he is developing and selling the residential structures as part of a package including the land. It is the structure and all its intricate components and related facilities that are the subject matter of the implied warranty. Those who hold themselves out as builders must be just as accountable for the workmanship that goes into a home ... as are builder-developers." *Moxley, supra*, at 735.

However, the implied warranty of habitability only applies to those who are in the business of building dwellings. *Hibbler v. Fisher*, 109 Idaho 1007, 712 P.2d 708 (Ct. App.1985); *Klos v. Gockel*, 87 Wash.2d 567, 554 P.2d 1349, 1352 (1976) (en banc); *Moxley, supra*.

By adopting the implied warranty of habitability, we did not intend to make builders or developers the insurers against any and all defects in a home:

> "The implied warranty of fitness [for habitability] does not impose upon the builder an obligation to deliver a perfect house. No house is built without de-

fects, and defects susceptible of remedy ordinarily would not warrant rescission. But major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to [relief]. The builder-vendor's legitimate interests are protected by the rule which casts the burden upon the purchaser to establish the facts which give rise to the implied warranty of fitness [for habitability], and its breach." *Bethlahmy, supra*, 91 Idaho at 68, 415 P.2d at 711.[7]

■ Although it is clear from the facts of the instant case that Coffin constructed the duplexes, there appears to be some dispute as to the precise relationship between Coffin and the Vander Boeghs. If the Vander Boeghs did no more than contract with Coffin to have the duplexes built, then the implied warranty would only extend from Coffin. If, on the other hand, the Vander Boeghs had expertise in the construction business and exercised control over the construction of the duplexes, as would a builder-developer, then the implied warranty would extend from the Vander Boeghs and not Coffin.

Construing the facts in favor of Tusch Enterprises, we note that Robert Vander Boegh had many years of experience in the road construction business. Regarding the duplexes, he contracted with Coffin to have the structures built. He contracted with others to level the land and make other site preparations. He periodically visited the site during the construction phase and consulted with Coffin about the possibility of fill dirt existing under the south duplex. Coffin stated that he relied upon Vander Boegh's expertise in these matters. From

---

7. *See Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675, 681–82 (1984), which states:

"Habitability is synonymous with suitability for living purposes"; the house must be occupiable. *See Trentacost v. Brussel*, 82 N.J. 214, 225, 412 A.2d 436 (1980) ('At a minimum, the necessities of a habitable residence include sufficient heat and ventilation, adequate light, plumbing and sanitation and proper security and maintenance.'); *Marini v. Ireland*, 56 N.J. 130, 146, 265 A.2d 526 (1970) (habitability covers 'vital facilities necessary to maintain premises in a livable condition'); *Chess v.*

*Muhammad*, 179 N.J.Super. 75, 77, 430 A.2d 928 (App.Div.1981) (referring to habitability in terms of 'facilities vital to the use of the premises'); *Campbell v. Randville Const. Corp.*, 172 N.J.Super. 93, 96–97, 410 A.2d 1184 (App.Div.), certif. denied, 84 N.J. 405, 420 A.2d 325 (1980) (implied warranty did not include health of trees on property of new home).

*See also*, cases cited by *Gaito, supra*, 327 S.E.2d at 877; Annot., 25 A.L.R.3d 383 (1969); and Annot., 10 A.L.R.4th 385 (1981).

these facts it cannot be concluded that there is no genuine issue as to whether Vander Boegh was a developer-builder or merely an ordinary person with little expertise who contracted with others to have a house built for him. Although it appears Coffin may have been ultimately responsible for constructing duplexes that were habitable, it is not for us to weigh the facts. That function rests with the trier of fact. Whether the implied warranty of habitability extends from the Vander Boeghs or Coffin, Tusch Enterprises has alleged major defects in the construction of the south duplex which would fall within the warranty.

Having found that genuine issues of material fact exist, we hold that it was error for the court below to dismiss Tusch Enterprises' implied warranty of habitability claim against Vander Boeghs.

### D. COFFIN

 Construing the facts again in favor of Tusch Enterprises, we conclude that they are sufficient to raise an issue as to whether Coffin was a builder in the sense that an implied warranty of habitability would flow from him. The Court, however, must consider a remaining issue: whether a subsequent purchaser of residential dwellings may assert a claim for breach of the implied warranty of habitability against the builder of the dwellings when there is no privity of contract between them.

The growing trend among other jurisdictions is to extend the implied warranty of habitability to subsequent purchasers. The following courts have so extended the doctrine: *Barnes v. Mac Brown & Co., Inc.,* 264 Ind. 227, 342 N.E.2d 619 (1976) (cracks in basement walls); *Moxley, supra,* (Wyo. 1979) (defective electrical wiring); *Terlinde v. Neely,* 275 S.C. 395, 271 S.E.2d 768 (1980) (foundation settled causing walls to crack, floors to sink, doors to not close properly, etc.); *Hermes v. Staiano,* 181 N.J.Super. 424, 437 A.2d 925 (N.J.Super. Ct.Law Div.1981) (defects in foundations wall and underground sewage disposal system); *Blagg v. Fred Hunt Co., Inc.,* 272 Ark. 185, 612 S.W.2d 321 (1981) (strong

odor and fumes from formaldehyde); *Elden v. Simmons,* 631 P.2d 739 (Okla.1981) (defective bricks); *Redarowicz, supra,* (1982) (defects in chimney and wall); *Keyes v. Guy Bailey Homes, Inc.,* 439 So.2d 670 (Miss.1983) (foundation cracked); *Gupta v. Ritter Homes, Inc.,* 646 S.W.2d 168 (Tex. 1983) (foundation settled excessively causing walls to crack, roof to leak, and patio to pull away from house); and *Richards v. Powercraft Homes, Inc.,* 139 Ariz. 242, 678 P.2d 427 (1984) (en banc) (faulty pipes, separation of floors from walls, cracking of walls, doors that would not close, etc.).

In choosing to follow this trend, the Arizona Supreme Court explained that limiting the implied warranty to first buyers would not only be arbitrary, but might encourage sham first sales calculated to insulate builders from liability. They explained further:

"The same policy considerations that lead to [our adoption of the implied warranty of habitability for sales of new homes]—that house-building is frequently undertaken on a large scale, that builders hold themselves out as skilled in the profession, that modern construction is complex and regulated by many governmental codes, and that homebuyers are generally not skilled or knowledgeable in construction, plumbing, or electrical requirements and practices—are equally applicable to subsequent homebuyers. Also, we note that the character of our society is such that people and families are increasingly mobile. Home builders should anticipate that the houses they construct will eventually, and perhaps frequently, change ownership. The effect of latent defects will be just as catastrophic on a subsequent owner as on an original buyer and the builder will be just as unable to justify improper or substandard work. Because the builder-vendor is in a better position than a subsequent owner to prevent occurrence of major problems, the cost of poor workmanship should be his to bear." *Richards, supra,* 678 at 430.

 We adopt the reasoning of these courts, but with the following proviso:

"This extension of liability is limited to latent defects, not discoverable by a subsequent purchaser's reasonable inspection, manifesting themselves after the purchase. The standard to be applied in determining whether or not there has been a breach of warranty is one of reasonableness in light of surrounding circumstances. The age of the home, its maintenance, the use to which it has been put, are but a few factors entering into this factual determination at trial." *Barnes, supra,* 342 N.E.2d at 621.

This extension to subsequent purchasers is also limited to latent defects which manifest themselves within a reasonable time. *Redarowicz, supra,* 65 Ill.Dec. at 411, 441 N.E.2d at 331; *Moxley, supra.* Further:

"The burden is on the subsequent owner to show that the defect had its origin and cause in the builder-vendor.... Defenses are, of course, available. The builder-vendor can demonstrate [that the suit was not brought within the appropriate statute of limitations,] that the defects are not attributable to him, that they are the result of age or ordinary wear and tear, or that previous owners have made substantial changes." *Richards, supra,* 678 P.2d at 430.

We recognize that in *Salmon Rivers Sportsman Camps, Inc. v. Cessna Aircraft Co.,* 97 Idaho 348, 544 P.2d 306 (1975), a case dealing with a sale of goods, we held privity of contract is a prerequisite to recovery of pure economic losses in an action for breach of implied warranty. Nonetheless, in *State v. Mitchell Construction Co.,* 108 Idaho 335, 699 P.2d 1349 (1984), three members of this Court expressed the view that this privity requirement should be abolished. *Salmon Rivers* was decided prior to our decision in *Clark, supra.* As noted earlier, *Clark* held that a party suffering only economic losses could not recover under a negligence theory. The rationale behind that decision was to allow the law of contracts to resolve disputes concerning economic losses. If, however, in the area of pure economic losses, negligence is to be preempted by contract principles, as we ruled in *Clark,* then contract principles must be given a freer hand to deal with injuries the law has typically redressed. Therefore, we decline to extend the privity requirement enunciated in *Salmon Rivers* to the facts at hand.[8] The instant case is not a goods case, and the question regarding the continued vitality of *Salmon Rivers* in such cases is better left to another day when a response on our part would be something more than mere dictum.

We hold only that subsequent purchasers of residential dwellings, who suffer purely economic losses from latent defects manifesting themselves within a reasonable

---

8. Although the instant case does not involve the sale of goods, the products liability nature of the action is self-evident. Our decision today, allowing recovery on misrepresentation and warranty theories, but not under negligence for pure economic losses (as those losses are defined by *Salmon Rivers*), is supported by respected authority. In § 101 of The Law of Torts, Prosser & Keeton explain their view as to the proper theories for recovering "intangible direct and consequential economic loss resulting from the inferior quality or unfitness of the product adequately to serve the purchaser's purposes":

"Historically, therefore, the only tort action available to a disappointed purchaser suffering intangible commercial loss has been the tort action of deceit for fraud and the only contract action has been for breach of a warranty, express or implied. This remains the generally accepted view. A few courts in recent years have permitted either a tort action for negligence or one in strict liability.

Usually, the reason for so doing has been to escape the requirement of privity of contract as a prerequisite to recovery on a warranty theory. But the elimination of this requirement for recovery on a contract-warranty theory would seem to constitute the more satisfactory technique." Prosser & Keeton, *The Law of Torts,* § 101, at 708 (5th ed. 1984) (footnotes omitted).

These authors also assert that recovery on a theory of strict liability in tort for damage to property which is the subject of the commercial transaction at issue is not the preferred route. *Id.,* at 709 ("[T]he risk of harm to the product itself due to the condition of the product would seem to be a type of risk that the parties to a purchase and sale contract should be allowed to allocate pursuant to the terms of the contract."). *Accord, Clark, supra,* 99 Idaho, at 333–34, 581 P.2d at 791–92 (dictum); *Sharp Bros. v. American Hoist & Derrick Co.,* 703 S.W.2d 901 (Mo. 1986) (en banc).

time, may maintain an action against the builder (or builder-developer, as the case may be,) of the dwelling based upon the implied warranty of habitability despite the fact that no privity of contract exists between the two. Any other holding would lead to an absurd result. For example, suppose an unscrupulous builder constructed a home of inferior quality and sold it to another. Suppose further, that for whatever reason, the buyer after three months sold the home to a second purchaser. And one month later the foundation of the house split apart rendering the home valueless. Should the common law deny the subsequent purchaser a remedy against the builder merely because there is no privity of contract and because the damages happen to be purely economic, when it was the conduct of the builder which created the latent defect in the first place?

We conclude that it was error for the court below to enter summary judgment in favor of Coffin on Tusch Enterprises' implied warranty of habitability count.

The decision of the court below is affirmed as to the negligence and express warranty counts. The decision granting summary judgment against Tusch Enterprises on the misrepresentation and implied warranty counts is reversed, and remanded for further proceedings not inconsistent with this opinion.

Costs to appellants.

No attorney fees on appeal.

BISTLINE and HUNTLEY, JJ., concur.

BISTLINE, Justice, specially concurring in the Court's opinion:

Having concurred in the majority opinion, I write only to inform the trial bench and bar that the *Salmon Rivers v. Cessna Aircraft Co.* case, which is recognized as having continued but doubtful validity in the opinion for the Court, was specifically overruled in the *State v. Mitchell* case, also mentioned in our opinion. West Publishing Co. correctly observed this in its syllabus to the *Mitchell* case, "Privity of contract is not required in a contract action to recover economic loss for breach of implied warranty; overruling *Salmon Rivers*," supra, 108 Idaho at 335, 699 P.2d at 1349, 1350. It was only after rehearing in *Mitchell* that I pointed to (and attached) the district court's decision based entirely on *Salmon Rivers'* non-privity holding, and joined the views of Justices Huntley and Donaldson as to the validity of the *Salmon Rivers'* holding. Although West Publishing observed my change of views and vote, Donaldson, J., did not change his concurrence with Justice Bakes' opinion. Hence, the judgment affirming the district court stood up on rehearing even though *Salmon Rivers*, the backbone of the district court's decision granting a summary judgment of dismissal, was overruled. It is a bit of an anomaly.

BAKES, Justice, concurring in part and dissenting in part:

I concur in the Court's opinion with the exception of Part V(D). Part V(D) holds, in effect, that a builder is liable in a contract action to a remote purchaser of housing even though no contract exists between the two persons. The Court states, *ante* at 50–51, 740 P.2d at 1035–36 "We hold only that subsequent purchasers of residential dwellings, who suffer purely economic losses from latent defects manifesting themselves within a reasonable time, may maintain an action against the builder (or builder-developer, as the case may be), of the dwelling *based upon the implied warranty of habitability despite the fact that no privity of contract exists between the two.*"

Privity of contract is a "relationship which exists between two or more contracting parties." Black's Law Dictionary, 1079 (5th ed. 1979). Causes of action based upon breach of warranty, whether express or implied, are contractual in nature. As stated in 77 C.J.S. Sales § 302 (1952). "Warranties may be either express or implied, but in either event the relations between the parties arise out of a contract and are not based on what is known as tort or on duties imposed by law or on any theory unrelated to contract." It is a sheer contradiction for

52

the Court today to hold that a subsequent buyer has a cause of action against a builder "upon the implied warranty of habitability" and then state that no privity of contract need exist between the two. I agree with Chief Justice Shepard that the Court's action today is not based upon the well established and understood cause of action in contract for breach of implied warranty, but has created a new cause of action in tort.

Implied warranty, as a legal concept, grew out of the law relating to express warranty provisions in contracts. The courts recognized that even though parties may or may not have expressly agreed as to what was warranted, that certain understandings, if not expressly disclaimed, were implied by the nature of the transaction. Thus, in the sale of property, if nothing was said with regard to the condition of title, a trier of fact nevertheless might be warranted in finding from the nature of the transaction that an implied warranty of good title existed. Of course, the facts could support a finding otherwise, as in the case where the sale was by quitclaim deed and the consideration paid was nominal. Under those circumstances, a finder of fact would be justified in determining that no implied warranty of title existed. Similarly, in the case of the sale of food, a finder of fact is justified in finding an implied warranty that the product is fit for human consumption. However, it would not be difficult to think of circumstances in which no such implied warranty would be justified. Thus, perishable food commodities which were deteriorating and which were sold to a pig farmer, would probably not justify an implied warranty of fitness for human consumption. If the pig farmer attempted to salvage some of the spoiled commodities and resold them to a third party for human consumption, would the original seller be responsible in a contract action to the subsequent purchaser from the farmer for breach of an implied warranty of fitness for human consumption? The Court's decision today would support such a warranty claim. Whatever expectations a third party purchaser has with regard to the quality of a product, and whatever rights the law gives him against the

original manufacturer of the product, should be based either upon tort law, or some statutory obligation, not based upon a contract cause of action for breach of implied warranty with its privity requirement removed.

Today's decision will result in a great deal of uncertainty. The Court's opinion does not define what is required to establish a *prima facie* case under its new cause of action, or what the applicable burden of proof should be. The opinion is silent as to whether tort or contract statutes of limitations will apply, in fact suggesting that maybe neither would be applicable, but that some other "reasonable time" period might be. *Ante* at 50, 740 P.2d 1035. A limitation period which commences only upon the appearance of "latent defects manifesting themselves within a reasonable time" will prove to be the most elusive part of the Court's opinion today. It will require the issue to be litigated in every case.

The new cause of action established in this case may well cause an inundating flood of litigation before the numerous ambiguities and uncertainties caused by it are resolved. I believe it would have been better if the Court today had decided this case on existing legal principles, which are adequate to the task, rather than create this new uncertain cause of action.

SHEPARD, Chief Justice, dissenting.

The majority of this Court continues its recent trend in creating new causes of action where none had previously existed. Today another enormous step is taken which will resound through the construction and real estate business in Idaho. An implied warranty of habitability is created between a builder of commercial buildings and persons with whom the builder had no contract or contact whatsoever until the buildings were resold approximately five years after construction. The majority also creates an implied warranty of habitability between the subsequent purchaser and a previous owner who contracted with the builder to erect the buildings. The Court further sustains a cause of action for misrepresentation between the original

owner and the subsequent purchaser on the sole basis that the original owner allegedly made the statement that the buildings were of good quality construction. The record is absolutely silent as to either the original owner or the builder possessing any knowledge that the quality of construction was other than good. The majority opinion is based on the sole premise that the building was not of good quality because it was built on fill soil. Both the builder and the former owner hotly deny that the buildings were constructed on fill, and both testified extensively and in detail in their depositions regarding the nonexistence of fill. While there may be some factual controversy regarding a later discovery of fill material during later excavation by the subsequent purchasers, there is a total lack of evidence that the former owner or builder had any knowledge of fill conditions at the construction site.

The majority has utilized a peculiar set of factual circumstances as a vehicle to announce its new theories of law. The plaintiffs in this case, as contrasted with those in cases cited by the majority, are not unknowing buyers of a residence built by an unscrupulous builder/developer. Rather, plaintiffs are a sophisticated and knowledgeable group of investors in real estate. Fifty percent of the corporation is owned by a California investor who buys and sells real property as a business, and who owns a hospital complex.

The former owner of the property contracted with a company for the site preparation which involved the carving out of a portion of a hillside. Thereafter, the former owner contracted with the builder Coffin for the construction of three buildings, each containing two apartments on that site. Construction was completed in 1975. Thereafter, the former owner utilized the buildings as a source of rental income and experienced no problems with the property.

Plaintiff Tusch expressed an interest in purchasing the property in 1979. One of the Tusches, a licensed realtor in Pocatello, thoroughly inspected the properties, including the foundations, in which she reported observing some cracking. Thereafter that same member of the Tusch group drafted an earnest money agreement, the terms of which were later incorporated into a real estate contract. Those documents indicate that the buyer, the Tusches, had not received or relied upon any statements or representations by the seller, the Vander Boeghs. They further indicate, "[t]he purchasers have fully inspected the above-described premises and know just exactly what they are purchasing." Certain warranties are contained therein, and all others are disclaimed. There is no assertion that any of the described warranties have been breached in the instant case.

Based on the foregoing, the majority has affirmed the decision of the trial court as to allegations of express warranties, but strangely holds that the alleged representation of Vander Boegh as to good quality construction is not barred by the contract language. Neither, says the majority, is a claim for breach of an implied warranty of habitability barred by the contract language.

The majority decision relies heavily upon the decision of *Bethlahmy v. Bechtel*, 91 Idaho 55, 415 P.2d 698 (1966). In *Bethlahmy*, the defendant had constructed a new residence, and in the course thereof had buried an open irrigation ditch beneath a portion of the residence. Not surprisingly, water seeped into the basement of the house making it totally uninhabitable, and plaintiffs Bethlahmy were required to abandon the house which they had purchased. Under those circumstances, the *Bethlahmy* Court held that a doctrine of implied warranty would be adopted only in cases involving sales of new houses by the builder.

> The old rule of *caveat emptor* does not satisfy the demands of justice in such cases. The purchase of a home is not an every day transaction for the average family and in many instances is the most important transaction of a lifetime. To apply the rule of *caveat emptor* to an inexperienced buyer, and in favor of a builder who is daily engaged in the business of building and selling houses is manifestly a denial of justice.

Obviously, the instant case is a far cry from the circumstances of *Bethlahmy*.

Much of the other authority cited by the majority is likewise inapplicable to the circumstances of this case, *i.e.*, "[i]t is wholly impractical for the *typical middle-class homebuyer* to employ a series of experts in various aspects of construction to examine his prospective purchase." (Emphasis added.) The majority asserts that the implied warranty of habitability "is rooted in considerations of public policy," and quotes various authorities:

> The mores of the day have changed and *the ordinary home buyer* is not in a position to discover hidden defects in a structure. *A home buyer* should be able to place reliance on the builder or developer who sells him *a new home*, the purchase of which in so many instances, is the largest single purchase a family makes in a lifetime. (Emphasis added.)
>
> . . . .
>
> The implied warranty of fitness [for habitability] does not impose upon the builder an obligation to deliver a perfect house. No house is built without defects, and defects susceptible of remedy ordinarily would not warrant rescission. But major defects which render the house unfit for habitation, and which are not readily remediable, entitle the buyer to [relief].

In short, the evidence in the record does not disclose that the circumstances here fit within the parameters of any of the authorities cited by the majority. The property in question here is not a new residence, but rather a five-year-old complex of income producing commercial properties. The Tusches did not purchase the property from the builder. The only evidence indicates that if the site contained fill, neither the Vander Boeghs nor Coffin was aware of its existence. As to habitability, Mrs. Tusch testified that she felt compelled to reduce the rent somewhat in one of the six apartments, and that two of the apartments were vacant during the period of construction from May through September of 1981. Other than those problems, she testified: "I have never had an extended vacancy in any of my units, and the only vacancies that there really were was between tenants for short periods of time until they had been re-rented."

I note further, that the doctrinal rule created by the majority contains no limits as to the age of the buildings or how the state of the art in construction is to be considered, if at all; nor does it consider if only the second purchaser is to be "protected," or whether the fifteenth purchaser also benefits by this new cause of action.

Hence, I would adhere to the rule in *Bethlahmy* regarding transactions between a builder/vendor and purchaser of a new residence when the circumstances are such that the residence becomes totally uninhabitable. I would decline to extend the doctrine of implied warranty of habitability to the circumstances of the instant case.