809 P.2d 487

**MANAGEMENT CATALYSTS, a partnership dba M.C. Leasing Co.; Transtector Systems, Inc., an Idaho domiciliary formerly known as Konic International; Richard Odenburg; and Frank Honorof, Plaintiff-Appellants,**

v.

**TURBO WEST CORPAC, INC., and/or Turbo West, Inc., Defendants,**

and

**Piper Acceptance Corporation; and Piper Aircraft Corporation, Defendant-Respondents.**

**PIPER ACCEPTANCE CORPORATION, Counterclaimant-Respondent,**

v.

**MANAGEMENT CATALYSTS, dba M.C. Leasing Co.; Richard Odenburg and Frank Honorof, Counterdefendant-Appellants.**

No. 17794.

Supreme Court of Idaho,
Coeur d'Alene, October 1990 Term.

March 5, 1991.

Rehearing Denied May 6, 1991.

Cosho, Humphrey, Greener & Welsh, Boise, for plaintiff-appellants. Rory R. Jones, argued.

Smith & Cannon, Lewiston, for defendants-respondents. Jerry V. Smith, argued.

BAKES, Chief Justice.

Plaintiff appellants Management Catalysts (M.C. Leasing), Transtector Systems (Transtector), and Richard Odenburg and Frank Honorof brought suit against defendant respondents Turbo West Corpac (Turbo), Piper Acceptance Corporation (Piper Accep.), and Piper Aircraft (Piper Air). Plaintiffs sought damages for economic loss arising out of the purchase of an allegedly defective airplane. Plaintiffs' initial complaint claimed breach of contract, breach of warranty, misrepresentation, and violation of the Idaho Consumer Protection Act.

On December 9, 1983, M.C. Leasing and the individual appellants entered into a contract for the purchase of a Cheyenne IIIA aircraft (002) from Turbo, an authorized dealer of Piper Air. Piper Air manufactured 002. The contract contained a condition that 002 would be leased back to Piper Air for a 90–day period. The contract also contained a general disclaimer of warranties, except an express limited warranty for 360 days or 1000 flight hours, whichever occurred first. Turbo assigned its rights under the contract to Piper Accep. M.C. Leasing and the individual appellants then leased 002 to Transtector.

On June 22, 1984, on a flight from Rapid City to Coeur d'Alene, the pilots of 002 experienced some control problems which resulted in a loss of elevation and pitch oscillations, allegedly traumatizing both pilots and passengers alike. The pilots took several defensive measures, including disengaging the autopilot, which seemed to correct the problem, and continued to Coeur d'Alene without further incident.

On June 25, 1984, Turbo put together a team composed of Turbo mechanics, a Piper autopilot expert, and several engineers to investigate the incident. Representatives of appellants denied the Turbo team access to 002. Appellants denied access to 002 because Mr. Honorof claimed that Piper and its representatives had allegedly falsified documents and committed perjury in previous litigation and had been sanctioned therefor.

On July 6, 1984, appellants served a document on Piper Air purporting to revoke acceptance of 002. On July 11, 1984, this action was commenced by appellants by the filing of a 7–count complaint alleging, *inter alia*, breach of warranties, violation of the Consumer Protection Act, revocation of contract and rescission of contract. After

the complaint was filed, Piper obtained a discovery ruling finally allowing it to inspect 002.

In the meantime, Transtector ceased to use 002 and obtained use of an alternative aircraft while Piper's inspections took place. On October 5, 1984, Piper and Turbo inspected 002 and concluded that it contained no defects and that the earlier incident was caused by pilot error. In February, 1985, 002 was flown to California for further separate testing by Transtector to determine what caused the earlier flight problems. The diagnosis from Transtector's testing was that 002's control cables froze in flight; the cause of the freezing was unknown. Piper and Turbo insisted that 002 was airworthy and, based on these assertions, Transtector put the aircraft back into service in July, 1985.

On October 31, 1985, Transtector employees were returning from Milwaukee on the aircraft. It had sat in the rain for several hours prior to flight. On the return home, at approximately 28,000 feet, the pilots again lost control of the elevator and rudder control, which had frozen up. Again the plane suffered a loss of altitude that was not cured until the plane dropped below freezing level. An accumulation of water apparently caused the blockage of certain drain holes that in turn caused the controls to freeze. After this incident, Transtector again refused to use 002.

On January 2, 1986, appellants filed an amended complaint adding claims based on negligence and gross negligence. On August 11, 1987, the trial court issued an order regarding cross motions for summary judgment in which the trial court dismissed plaintiffs' claims for negligence and gross negligence on the basis that only economic loss was sought and, hence, could not be recovered in tort.

On April 7, 1988, the trial court issued an additional order granting partial summary judgment in favor of the defendants. This order dismissed all of Transtector's claims against Piper Aircraft and further dismissed M.C. Leasing's and the individual appellants' breach of contract and warranty claims against Piper Aircraft. The above dismissals were based upon a lack of privity between the parties. On June 30, 1988, the trial court issued a clarifying order reaffirming its dismissal of all appellants' breach of contract and breach of warranty claims against Piper Aircraft and dismissing Transtector's breach of contract and breach of warranty claims against Turbo and Piper Acceptance. Again, the basis for these dismissals was a lack of privity.

On July 22, 1988, at a pretrial conference, the trial court advised the parties that the issue of whether Piper's express limited warranty failed of its essential purpose was alive and well and, to that extent, the April 4, 1988, order granting summary judgment was modified.

Jury trial on the remaining claims commenced on August 15, 1988, and went to the jury on September 7, 1988. The issues submitted to the jury upon special interrogatories were (1) fraudulent misrepresentation as to airworthiness of 002; (2) failure of the essential purpose of Piper's express limited warranty; (3) breach of warranties as to Transtector contained in the Transtector-Piper lease; and (4) violation of the Consumer Protection Act. The jury returned its verdict in favor of Piper Aircraft and the other defendants. The court entered judgment on the verdict and awarded attorney fees and costs based upon I.C. § 12–120, I.C. § 12–121, and I.R.C.P. 54(e)(4).

Appellants raise the following issues on appeal: (1) whether the trial court erred in dismissing various plaintiffs' claims for breach of contract and for breaches of express and implied warranties for lack of privity; (2) whether the trial court's evidentiary rulings denied plaintiffs a fair trial; and (3) whether the trial court erred in awarding attorney fees to defendants.

Regarding the dismissal of appellants' claims of breach of implied warranties for lack of privity, the record reveals that Piper Aircraft did extend an express limited warranty to appellants. That warranty provided essentially that Piper would repair or replace defective parts for a period of 360 days or 1000 flight hours, whichever occurred first. The express warranty pro-

vided by its terms that it was exclusive and disclaimed all other warranties, express or implied. The U.C.C. expressly provides that the parties may contract away all or a part of express or implied warranties. I.C. § 28-2-316; *Glenn Dick Equipment Co. v. Galey Constr., Inc.,* 97 Idaho 216, 541 P.2d 1184 (1975).

The issue of whether Piper complied with the express limited warranty, or whether the warranty failed of its essential purpose, was tried to the jury below. The parties presented evidence on that issue and the jury was instructed that: "To prove a breach of Piper Aircraft Corporations express limited warranty, plaintiffs ... must establish" (list of elements for recovery), and also that, "If you find that plaintiffs have proven each element, then you must find in favor of said plaintiffs and against Piper Aircraft Corporation." Further, the jury was instructed that:

> If you find that Piper Aircraft Corporation's manufacturer's express warranty to repair or replace has failed of its essential purpose, plaintiff MC Leasing is entitled to recover for any breach of any warranty made by Piper including any implied warranty of merchantability, implied warranty of fitness for a particular purpose or express warranty.

After furnishing the jury with the foregoing instructions, the trial court submitted special interrogatories on the express warranty issue and the jury returned a verdict in favor of Piper, finding the express limited warranty had not failed of its essential purpose. There is evidence to support that finding, and the appellants do not claim otherwise. The jury having upheld the express limited warranty, with its disclaimer of all other warranties, express or implied, effectively disposes of appellants' other express and implied warranty claims.

Appellants next argue that the trial court erred in dismissing their breach of contract claims on the basis that there was no privity between plaintiffs and Piper Aircraft. However, the record reveals that, as between appellants and Piper Aircraft, there was no contractual relationship. M.C.

Leasing contracted with Turbo for the purchase of the aircraft. Subsequently, M.C. Leasing leased the aircraft to Transtector. At the summary judgement hearing on April 7, 1988, the trial court dismissed plaintiffs contract claims against Piper Aircraft, reasoning that: "no contractual relationship existed between Plaintiffs and Defendant Piper Aircraft Corporation...." Appellants offered no evidence that any contractual relationship existed between plaintiffs and Piper Aircraft. Accordingly, the decision of the trial court dismissing the contract claim is affirmed. *Day v. CIBA Geigy Corp.,* 115 Idaho 1015, 772 P.2d 222 (1989).

We now turn to appellants' contention that various evidentiary rulings of the trial court denied them a fair trial. Appellants argue that there were two areas in which certain evidentiary rulings prevented them from fully developing their case: (1) rulings regarding the plane's airworthiness, and (2) rulings on damages.

Initially, we note that trial courts are given discretion in the admission of evidence at trial, and their decisions will only be reversed when there has been a clear abuse of discretion. *Baker v. Shavers,* 117 Idaho 696, 791 P.2d 1275 (1990). Appellants point to numerous specific items of evidence which, they contend, should have been admitted. However, our review of the record shows that they were given ample opportunity to present evidence both with respect to the plane's airworthiness and with respect to damages. As to the issue of the plane's airworthiness, the plaintiffs were allowed to present the testimony of their witness Sommers, who testified that the plane was unsafe to fly either before or after October 31, 1985. Plaintiffs were also allowed to offer the testimony of pilot Hall who was allowed to answer every question asked and to give his opinion as to the overall condition of the plane.

With respect to the evidentiary rulings on damages, the plaintiffs argue essentially that, since there was so little damage proof admitted to the jury, and since the legal issues presented were so narrowly confined, the jury could not help believing

that appellants never really suffered any damage, thereby prejudicing their view of the liability issue. We are not persuaded by this argument. First, the record reveals that the court below fully instructed the jury on damages as to each and every theory of liability pursued by plaintiffs. Moreover, it is not unusual to have the issues of liability and damages bifurcated, and in such trials no evidence of damages is ever before the jury when the issue of liability is tried. *Yellowstone Pipeline Co. v. Grant Constr. Co.*, 95 Idaho 794, 520 P.2d 249 (1974). The trial court did not abuse its discretion with respect to its rulings on either the plane's airworthiness or the question of damages.

█ Finally, we address appellants contention that the trial court erred in its award of attorney fees. The trial court awarded attorney fees against plaintiffs' fourth and fifth causes of action for negligence and gross negligence under I.R.C.P. 54(e) and I.C. § 12–121 on the basis that those claims were brought and pursued frivolously. The court further awarded attorney fees on Counts I through VI under I.C. § 12–120(2) because those counts "were based upon a contract relating to the purchase and/or sale of goods." Attorney fees are not appropriate under I.C. § 12–121 and I.R.C.P. 54(e) unless all claims brought or all defenses asserted are frivolous and without foundation. Where there are "multiple claims and multiple defenses, it is not appropriate to segregate those claims and defenses to determine which were or were not frivolously defended or pursued. The total defense of plaintiff's proceedings must be unreasonable or frivolous." *Magic Valley Radiology Associates, P.A. v. Professional Business Services, Inc.*, 119 Idaho 558, 808 P.2d 1303 (1990). Without deciding whether appellants' negligence claims were frivolous, as the trial court found, such cannot be said of their express warranty claim. That claim was a legitimate, viable claim which was ultimately submitted to the jury for

consideration. Therefore, not all of plaintiffs' claims were frivolous, and thus the trial court erred in awarding attorney fees against appellants under I.C. § 12–121.

█ The trial court ruled in the alternative that fees were properly assessed against appellants under I.C. § 12–120(2). That section, as it existed at the time this case was filed, provided in pertinent part:

In any civil action to recover on an open account, account stated, note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, ... the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs.

I.C. § 12–120(2) (1979).[1]

In *Day v. CIBA Geigy Corp.*, 115 Idaho 1015, 772 P.2d 222 (1989), the plaintiff brought an action against the manufacturer of a chemical compound which caused damage to plaintiff's raspberry crop. The plaintiffs in *Day*, similar to the appellants in the instant action, pursued several theories of recovery, including claims for breach of express warranty, breach of contract, and negligence. The trial court in *Day*, similar to the trial court in the instant case, dismissed plaintiffs breach of contract claims because the plaintiffs did not purchase the product directly from the manufacturer and were thus not in privity. The trial court in *Day* denied an award of attorney fees against the plaintiffs under I.C. § 12–120(2) because, having dismissed the contract claims, the action could not have been one "to recover on a contract." We affirmed the action of the trial court in *Day*, stating that "to recover attorney fees under the statute, the action must be one to recover on the contract, not merely an action arising from a transaction relating to the purchase or sale of goods." 115 Idaho at 1018, 772 P.2d at 225. Based upon the interpretation of the statute in *Day*, the trial court's grant of attorney fees against appellants must be reversed; there being no contract between appellants

---

1. I.C. § 12–120 was amended in 1986 to allow attorney fees "in any commercial transaction." *See* Idaho Session Laws, ch. 205, p. 511. However, we have recently held in *Griggs v. Nash,* 116 Idaho 228, 775 P.2d 120 (1989), that this amendment should not be applied to cases filed before July 1, 1986. The plaintiffs' complaint in this case was filed prior to July 1, 1986.

and Piper Aircraft, the suit was not one "to recover on a contract."

JOHNSON, BOYLE and McDEVITT, JJ., concur.

BISTLINE, Justice, concurring and dissenting.

## I.

## ATTORNEY FEES

In that part of the Court's opinion which reverses the award of attorney fees, I concur.

## II.

## OF HUMAN LIFE, ECONOMIC LOSS, and a HOBSON'S CHOICE

The following analysis is furnished in the appellants' brief, and aptly states the basis for my dissent:

[T]he current dichotomy in Idaho law on recovery of economic damages in tort actions [is that] an Idaho plaintiff may not recover economic loss in negligence cases. According to the court, a remote purchaser (M.C. Leasing) in the chain of distribution has no contractual remedies against the manufacturer or anyone else in the distributive chain, other than the direct seller, and a remote user (Transtector) of the product has no contract claims because it is not in privity with the actual seller. Therefore, under Idaho law, persons damaged are left with a Hobson's choice: [such plaintiffs] can either attempt to convince a trial court to overturn the privity requirement and allow breach of warranty claims to proceed, or attempt to convince that same court to allow claims seeking economic loss in tort actions to proceed, or do both. The plaintiffs herein chose to follow both options, were allowed by the trial court to pursue neither, and were also assessed the attorney fees incurred by the parties which committed the acts giving rise to the lawsuit in the first place.

Proper analysis of this issue requires an examination of what is meant by the term "economic loss." The Idaho cases have denied recovery of economic loss in tort, due to a reluctance to use unintentional torts to protect the economic expectations of the parties. *See, e.g., Tusch Enterprises v. Coffin, supra,* 113 Idaho [37] at 40 [740 P.2d 1022 (1987)]. *Tusch* is the latest pronouncement on this issue, but all of the cases have dealt with product failures which simply failed to meet buyers' expectations and this denial was a product of the court's reluctance to reward buyers with lost income, profits or loss of use of a product. *See, Tusch Enterprises, supra,* (lost rental income and damage to structure); *State v. Mitchell, Constr. Co., supra* (defective roof); *Clark v. International Harvester Co.,* 99 Idaho 326, 581 P.2d 784 (1978) (lost profits and cost of repair).

This case is dramatically different. The evidence at trial established that controls on the aircraft which was the basis of this litigation, froze and caused a precipitous drop in altitude. The evidence showed that this occurred on two separate occasions. Understandably, the plaintiffs, therefore, refused to operate the aircraft and proceeded with the suit. The fact that the jury did not rule in plaintiffs' favor is irrelevant to this analysis.

While the relief sought in this case was economic in nature, the reason for the suit was plaintiffs' refusal to use the airplane, which only occurred because of the potential for calamitous personal injury or property damage. That factor was not present in any of the line of Idaho cases which has lead to the denial of economic injury in unintentional tort cases. The fact that the plaintiffs stopped using the airplane and therefore avoided a potential personal injury or death accident calls into question the wisdom of a system which would deny recovery to the purchaser who avoids personal injury or death and provides recovery to the purchaser who suffers the *calamitous event,* notwithstanding that such avoidance in mitigation of far more serious personal injury and damages results in some measure of 'economic loss.' This court should determine

whether the policy of this State should reward product users who continue to use a malfunctioning product until it causes injury or death, and deny recovery to a product user who quits using the product prior to injury or death.

Appellants' Brief, 31–33.