861 P.2d 71

**SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC., an Idaho nonprofit corporation, Plaintiff–Respondent,**

v.

**Philip M. KRUEGER and Allyn M. Krueger, husband and wife, Defendants–Appellants.**

**No. 19034.**

Court of Appeals of Idaho.

Feb. 21, 1992.

Petition for Review Denied Oct. 21, 1993.

Levy Law Offices, Boise, for defendants-appellants. Paul E. Levy argued.

Givens, Pursley, Webb & Huntley, Boise, for plaintiff-respondent. Terry L. Myers argued.

WALTERS, Chief Judge.

This is a debt collection action which arose out of a contract to construct a building. St. Alphonsus Regional Medical Center (the Hospital) advanced $150,000 to Dr. Philip Krueger and Allyn Krueger, husband and wife, (the Kruegers) to help get the building started. Ultimately, it was not built. The parties executed an agreement terminating the contract, releasing each other from liability, and agreeing that the Kruegers would repay the $150,000. The Kruegers signed a promissory note acknowledging the debt, but did not pay. The Hospital sued to collect and after a bench trial received judgment in its favor. The Kruegers appeal. We affirm.

### Facts

The facts in this dispute were well developed in the trial court's findings of facts, which we paraphrase as follows. Dr. Krueger is an obstetrician and gynecologist practicing in the Boise area. St. Alphonsus operates one of the two major hospitals in Boise. The other hospital is St. Luke's. Dr. Krueger held staff privileges at both hospitals. For many years St. Luke's was the sole provider of obstetrical hospital services in Boise. In the early 1980's St. Alphonsus opened a competing obstetrics unit, which operated below capacity because most obstetricians continued to send their patients to St. Luke's. St. Alphonsus desired to increase its share of the market and Dr. Krueger, who performed obstetrics at St. Luke's but much of his gynecological work at St. Alphonsus, expressed a desire to move his office closer to St. Alphonsus and develop a women's health center nearby.

On May 1, 1985, the Hospital and the Kruegers entered into a written contract by which the Hospital would advance them $150,000 and the Kruegers would construct a medical office building on land next to the Hospital to house an obstetrics and gynecology unit and a women's health center headed by Dr. Krueger. The contract stated that the building was required to be completed by March 31, 1986. The contract provided for a lease option of floor space for the Hospital, referral of patients from the center to the Hospital, and payment to Dr. Krueger of $50,000 at occupancy and $60,000 a year for consulting services. The contract stated in pertinent part:

8.1 *Preliminary Payment.* Saint Alphonsus shall pay Krueger [$150,000] upon the execution hereof. If the building shall not be constructed as herein provided, Krueger shall refund to Saint Alphonsus the entirety of his preliminary payment.

\* \* \* \* \* \*

11. *Termination.* This agreement shall terminate automatically; (i) if Krueger fails to remain in good standing on the medical staff of Saint Alphonsus; or (ii) remain a Board certified obstetrician or gynecologist in good standing throughout the term hereof; or (iii) if Krueger fails to construct a suitable building as provided herein; or (iv) if Krueger otherwise breaches his obligations hereunder. Nothing herein shall prevent Saint Alphonsus from seeking any available remedy at law or equity for breach of this Agreement or any provision thereof.

Both the Hospital and Dr. Krueger were aware that the agreement would be unpopular with competing obstetricians who had staff privileges at the Hospital, therefore, the negotiation and execution of the agreement were confidential. Nevertheless, the other obstetricians found out. They and other doctors on the staff pressured the Hospital to terminate the agreement, creating serious concern for the officers and directors of the Hospital. To maintain its

relationship with the other obstetricians, the officers and directors soon wanted to get out of the contract and considered cancelling it unilaterally before Dr. Krueger completely performed, but recognized that the contract was binding and continued to abide by its terms and hold Dr. Krueger to them.

On August 29, 1985, several of the obstetricians at the Hospital sued Dr. Krueger to enjoin construction of the building because it violated restrictive parking covenants attached to the land. The covenants had been placed there by the obstetricians when they sold the land to Dr. Krueger's predecessor-in-interest. Dr. Krueger bought the land knowing of the covenants and therefore knew of them when he entered into the contract with the Hospital. The trial judge in that case refused to enjoin Dr. Krueger. Over four years later, however, the decision was reversed by the Idaho Supreme Court, which directed the court to enjoin Dr. Krueger. *See St. Clair v. Krueger*, 115 Idaho 702, 769 P.2d 579 (1989). An injunction was issued on January 26, 1990, long after the events in dispute in the instant case. On the advice of his attorney, however, Dr. Krueger did not attempt to develop the land while the matter was before the trial court.

In September, 1985, Dr. Krueger informed the Hospital of the lawsuit. The parties discussed termination of their contract, but ultimately insisted on complete performance. Although the Hospital wanted out of the contract, it decided to wait and see whether Dr. Krueger would perform, notwithstanding the lawsuit and a letter the Hospital received from six obstetricians demanding that it withdraw its support of Dr. Krueger or the obstetricians would "boycott" the Hospital and take their business elsewhere. The Hospital did not tell Dr. Krueger about the letter. The parties negotiated another termination, but it was not executed. The medical community continued to pressure the Hospital to stop supporting Dr. Krueger and to withdraw from the contract. At the March 31, 1986, construction deadline the Kruegers had not broken ground for the building.

Thereafter, the Kruegers and the Hospital executed an agreement terminating the contract and stating in relevant part:

1. *Termination and Indemnity.* The Agreement is hereby unconditionally terminated and declared to be null and void and of no further force and effect. Krueger and Saint Alphonsus hereby mutually release and relieve each other ... from all obligations, liabilities, claims, causes of action, damages, costs, losses and/or expenses of any kind or nature whatsoever, in law and/or equity, whether known or unknown, arising out of or in any way associated or connected with the Agreement, tortuous [sic] interference with respect to the Agreement and/or termination of the Agreement.

2. *Repayment.* The parties hereby acknowledge that Saint Alphonsus made the payment to Krueger, which is specified in paragraph 8.1 of the Agreement. Krueger hereby agrees to repay the said payment to Saint Alphonsus by executing and delivering to Saint Alphonsus on the date hereof a promissory note....

The Kruegers paid no part of the promissory note and the Hospital sued. At trial, the Kruegers appeared *pro se*, agreed that they had paid nothing toward the note, and raised affirmative defenses of economic duress, fraud, impossibility, and breach of an implied covenant of good faith and fair dealing. The court entered judgment in favor of the Hospital for $283,075.20 which included the full amount of the promissory note, interest and attorney fees.

After judgment was entered, the Kruegers filed a "Motion to Reconsider Findings of Facts and Conclusions of Law" in which they requested that the last sentence of Finding 20 be amended from "... the evidence tends to indicate that St. Alphonsus was scrupulously fair in dealing with the Kruegers ..." to "... the evidence tends to indicate that St. Alphonsus acted in a business like manner in dealing with the Kruegers...." The court added the requested language but refused to delete the original language.

Before argument on the motion to reconsider, however, the Kruegers, now repre-

sented by counsel, filed a "Motion to Augment Post Judgment Motions" and requested an opportunity to present evidence that the contract between the Hospital and the Kruegers was void because it violated antitrust laws, restrictive covenants, and that the Hospital had mitigated its damages by later purchasing Krueger's land at auction. The court denied the motion.

### Issues

The primary question on appeal is whether there was substantial evidence to support the trial court's findings of facts and conclusions of law. This question is more conveniently addressed by breaking it into its component parts and asking whether the court erred when it found that:

(1) the Hospital did not force the Kruegers, through economic duress, to sign the termination agreement.

(2) there was no fiduciary relationship between the parties based on a joint venture, thus no duty on the Hospital to disclose its desire to end the contract and the negative forces of the competing obstetricians.

(3) the Hospital did not fraudulently induce the Kruegers to sign the termination agreement by not disclosing information.

(4) there was no breach of a covenant of good faith and fair dealing, that is, there was no other duty to disclose information to the Kruegers.

(5) the parties did not execute an addendum to the contract which would have altered the duties of each party under the contract.

(6) the contract was not impossible to perform.

(7) post-trial motions to consider new arguments would be denied because the Kruegers, although appearing *pro se,* would be held to the same standards as practicing attorneys who would have had to raise the arguments at trial.

(8) the court did not have to disqualify itself at the beginning of the trial because of a possible conflict of interest when the conflict was disclosed at the

outset and the parties raised no objection.

### Standard of Review

Our role in reviewing [the court's] finding of fact is limited. We do not weigh the evidence, nor do we substitute our view of the facts for the view of the trial judge. *E.g., Angleton v. Angleton,* 84 Idaho 184, 370 P.2d 788 (1962). We merely determine whether the finding is supported by substantial, albeit conflicting, evidence in the record. If so, the finding cannot be deemed clearly erroneous. *Rasmussen v. Martin,* 104 Idaho 401, 404, 659 P.2d 155, 158 (Ct.App.1983). We regard evidence as "substantial" if a reasonable trier of fact would accept it and rely upon it in determining whether a disputed point of fact has been proven. IDAHO APPELLATE HANDBOOK §§ 3.3.1 and 3.3.2.2 (Idaho Law Foundation, Inc. 1985).

As corollaries to these general principles, we give due regard to the special opportunity of the trial court to judge the credibility of witnesses appearing personally before it. I.R.C.P. 52(a).... Thus, we are not authorized to overturn a trial court's finding of fact, when it is supported by substantial evidence, even though we might have viewed the evidence differently had we sat as the triers of fact. *E.g., Cox v. Cox,* 84 Idaho 513, 373 P.2d 929 (1962); *Challis Irrigation Co. v. State,* 107 Idaho 338, 689 P.2d 230 (Ct.App.1984).

*Ortiz v. State, Dept. of Health & Welfare,* 113 Idaho 682, 683–84, 747 P.2d 91, 92–3 (Ct.App.1987).

### (1) Economic Duress

 An agreement to compromise and settle a dispute is an enforceable contract which supersedes and extinguishes all prior claims and defenses. *Hershey v. Simpson,* 111 Idaho 491, 495, 725 P.2d 196, 200 (Ct. App.1986); *Wilson v. Bogart,* 81 Idaho 535, 347 P.2d 341 (1959). In an action brought to enforce such an agreement, made in good faith, the court will not inquire into the merits or validity of the original claim.

*Wilson,* 81 Idaho at 542, 347 P.2d at 345. The agreement to compromise and settle is binding in the absence of fraud, duress or undue influence. *Id.*

■ The Kruegers argue that the termination agreement was induced by economic duress wielded by the Hospital. A party claiming economic duress must establish that: (1) he voluntarily accepted the terms of the agreement; (2) the circumstances permitted no alternative; (3) the circumstances resulted from the coercive acts of the other party. *Lomas & Nettleton Co. v. Tiger Enterprises,* 99 Idaho 539, 542, 585 P.2d 949, 952–53 (1978). Duress must result from the opposing party's wrongful and oppressive conduct and not from the claimant's necessities. *Id.* It cannot result merely from the opposing party's insistence on a legal right and the other party's yielding to the insistence. *Id.* The defense must be shown by clear and convincing evidence. *Id.*

■ The evidence supports the court's finding that the Kruegers did not satisfy these three requirements. Although the Kruegers voluntarily accepted the terms of the termination agreement, other alternatives were available. The Kruegers could have disputed their liability under the contract in a lawsuit before signing the termination agreement. Moreover, the Kruegers failed to prove wrongful and oppressive conduct by the Hospital. Although the Hospital did not tell the Kruegers of its desire to exit the contract and of the "boycott" letter, it did not actively interfere with Dr. Krueger's attempt to build the medical center or in other ways fail to meet the express terms of the contract.

### (2) Fiduciary Relationship

However, the Kruegers argue that the contract implied a greater duty to disclose by the Hospital, based on an alleged fiduciary relationship between the parties. At trial, the Kruegers attempted to show that there was a fiduciary relationship based on a joint venture.

■ A joint venture is analogous to a partnership and is defined as an association of two or more persons to carry out a single enterprise for profit. *Rhodes v. Sunshine Mining Co.,* 113 Idaho 162, 166, 742 P.2d 417, 421 (1987). A joint venture includes all of the following: a contribution of assets, a common undertaking, joint interest, right of mutual control, an expectation of profits, a right to participate in profits, and a limitation of the objective to a single enterprise. *Id.* at 165–66, 742 P.2d at 420–21. It may be express or implied by conduct; however, the intent of the parties controls. *Id.* at 166, 742 P.2d at 421. Sharing of profits and losses is an important consideration, but is not essential. *Id.* Whether a joint venture exists is primarily a question of fact for the trial court. *Id.*

■ The court found the parties had not undertaken a joint venture. The record reveals that such an arrangement was expressly considered early in contract negotiations but decided against. Further, the Hospital had no right or obligation to control or manage Dr. Krueger's activities and there was no sharing of profit and loss. The evidence supports a finding that there was no intent to form a joint venture. Consequently, the court's finding that there was no joint venture is not clearly erroneous and will not be disturbed. I.R.C.P. 52(a).

### (3) Fraud

The Kruegers claim that the Hospital fraudulently induced them to settle by failing to disclose the demands made by the competing physicians and the "boycott" letter. The court found no fraud and that finding is supported by the evidence.

■ Fraud involves (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted upon by the other party and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth of the statement; (8) the hearer's right to rely on the statement; and (9) injury. *Witt v. Jones,* 111 Idaho 165, 168, 722 P.2d 474, 477 (1986). Failure to dis-

close a fact may constitute fraud if one party owes a duty to another to disclose the fact. *Jones v. Maestas,* 108 Idaho 69, 71–72, 696 P.2d 920, 922–23 (Ct.App.1985). A duty to disclose may arise when (a) a party to a business transaction is in a fiduciary relationship with the other party; or (b) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or (c) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or (d) a party knows a false representation is about to be relied upon; or (e) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of the relationship between them or the customs of trade or other objective circumstances would reasonably expect a disclosure of the facts. RESTATEMENT, SECOND, *Torts* § 551(2).

■ The court determined there was no fraud because there was no fiduciary relationship or duty to disclose based on the Kruegers' assertion of a joint venture. Dr. Krueger argues that, notwithstanding the court's finding, he was in a special relationship with the Hospital because he is a doctor with staff privileges there, engaged with the Hospital in a contract that both wanted to keep private in order to avoid the ill will of the medical community. The Kruegers assert that they would not have proceeded under the contract and would not have signed the termination agreement and note if the Hospital had told them they were allegedly under no legal duty to repay the advance, that the Hospital wanted out of the contract, and that the Hospital was being pressured by third parties to withdraw.

The Kruegers had entered into a commercial contract, as debtor and creditor, to construct a building. Such a setting does not produce a special relationship requiring disclosure of the creditor's attitudes regarding the desirability of the contract, or the attitudes of third parties not under the creditor's control. *See Black Canyon Racquetball Club, Inc. v. Idaho First National Bank, N.A.,* 119 Idaho 171, 804 P.2d 900

(1991). By the express terms of the contract the Kruegers were under a legal duty to repay the advance. The Kruegers' assertion that they would not have continued with the contract had they been told certain things is not supported by the record. Before the construction deadline arrived, the parties negotiated but dismissed several termination agreements. Based on the foregoing, we determine that the court's finding regarding the lack of fraud is supported by substantial evidence.

### (4) Covenant of Good Faith

■ The Kruegers argue that an implied covenant of good faith and fair dealing should have governed the actions of the parties, and the Hospital breached that covenant when it did not communicate more to the Kruegers about inter-hospital dissention and the opposition levied by competing obstetricians. The court found that the Hospital was "scrupulously fair in dealing with the Kruegers and in standing by the contract, notwithstanding the pressure placed on it by competing obstetricians." The court also found that any breach of the covenant regarding performance under the contract was released under the provisions of the termination agreement. Because the allegation of breach of the implied covenant is so intertwined with allegations of fraud and duress, we will address it here.

This Court addressed an assertion similar to the Kruegers' in *Scott v. Castle,* 104 Idaho 719, 662 P.2d 1163 (Ct.App.1983). In *Scott,* the plaintiff/appellant asserted that he was not obligated to make payments on a promissory note he executed for the purchase of real estate. He claimed that the seller, knowing Scott wanted to subdivide the property, had breached an implied covenant by refusing to cooperate in executing a plat to subdivide. Scott claimed that the underlying contract was "subject to an implied covenant of good faith and fair dealing requiring that neither party should do anything which would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 104 Idaho at 722, 662 P.2d at 1166. This Court found no Idaho authority which

specifically implied such a covenant in real estate contracts, but we noted that "a contract includes not only what is stated expressly but also that which of necessity is implied from its language." *Id.* at 723, 662 P.2d at 1166. Assuming without deciding whether an implied covenant existed, we agreed with the trial court that the language of the contract did not obligate Castle to provide Scott with a subdivision plan, and that payment on the note was not subject to a condition requiring that the property be subdivided in a manner desired by Scott.

Our Supreme Court recently addressed the application of an implied covenant of good faith in a commercial relationship in *Black Canyon Racquetball Club, supra,* 119 Idaho 171, 804 P.2d 900. In that case, the Court found no fiduciary relationship existed between a commercial lender and borrower to produce the covenant. It found that a bank and its customer, parties to an alleged oral agreement to provide a loan, stood merely as debtor and creditor. A fundamentally similar claim of a "tort of bad faith" was raised but discounted by the Court because there was no special or personal relationship between the parties. *Compare White v. Unigard,* 112 Idaho 94, 730 P.2d 1014 (1986) (special relationship exists between insured and insurer because of personal nature of contract). The Court also found that the bank had no legal duty to disclose information showing the loan was unlikely to be approved because there was no fiduciary relationship between the parties.

Assuming without deciding that an implied covenant of good faith and fair dealing might apply in a commercial real estate setting, we hold that there was no breach of the covenant in this case. There was no fiduciary relationship between the parties and as the trial court found, a breach "is not shown by evidence that one party exercised or insisted on its rights under a contract." *First Security v. Gaige,* 115 Idaho 172, 176, 765 P.2d 683, 687 (1988). Although the contract spoke in terms of "encouraging" development of the medical center, the language does not imply a duty for the Hospital to disclose negative attitudes about the project expressed by internal and external sources, when those attitudes did not actively interfere with the Kruegers' ability to perform.

### (5) Addendum

The Kruegers argue that the Hospital also breached the building contract because it had executed an addendum providing that it would develop a "level II" obstetrics unit to complement the services Dr. Krueger was to provide, but failed to develop the unit. The court found that the addendum, although signed by Dr. Krueger, was never signed and executed by the Hospital. The document appears as exhibit 84 in the record signed only by Dr. Krueger and his attorney. The attorney testified that the Hospital had never signed the addendum. The court's finding is supported by the evidence.

### (6) Impossibility

█ Next, the Kruegers argue that performance of the contract was impossible from the outset because of a restrictive covenant which required a certain number of parking spaces that were not included in the plans for the building. The court found this argument to be one of three advanced in post-judgment motions, but not raised at trial, and declined to grant the motion allowing argument on the issue. Also, the court made no specific finding on this issue. However, the Kruegers state in their answer to the Hospital's complaint:

> Further, Saint Alphonsus Regional Medical Center was aware of an injunction brought by Drs. Duane St. Clair, Darrell Ludders and Jon Kattenhorn, all signers of the Letter that prohibited defendant Philip M. Krueger from performing according to the terms of the contract.

Read in context of the answer, this paragraph addresses the influence the "boycott" letter had on the Hospital and the Hospital's failure to inform Dr. Krueger of the letter. However, the Kruegers implicitly argued impossibility at trial, so we will address it here.

The Kruegers assert that the restrictive parking covenant prohibited development and that because the Supreme Court had held that the proposed building violated the covenant, the contract was impossible to perform and void from its inception. The Kruegers cite *Quagliana v. Exquisite Home Builders, Inc.*, 538 P.2d 301 (Utah 1975), for the proposition that a contract to build is void from the start if by its terms, it is impossible to perform. In that case, a home contracted to be built according to all applicable laws and regulations and to provide a view could not meet those requirements given the size of the home and the lot where it was to be built. The court held that the physical impossibility of meeting the setback requirements while achieving the purposes of the contract meant the contract was void and could not be breached because it effectively ceased to exist.

In *St. Clair v. Krueger, supra*, 115 Idaho 702, 769 P.2d 579, the Court stated that when Dr. Krueger bought the land he knew of the restrictive covenant and thereafter he entered into the contract with the Hospital to build the medical center. However, the Kruegers did not establish at trial that the Hospital knew of the covenant until Dr. Krueger told them that Dr. St. Clair was seeking an injunction. "When the impossibility is known to the promisor at the time of making his promise, but not to the promisee, the promisor must be taken to have intended to make himself absolutely liable, without regard to performance of the condition." 17A C.J.S. *Contracts* § 462, p. 607. *Compare Faria v. Southwick*, 81 Idaho 68, 337 P.2d 374 (1959) (where both parties to a contract are without knowledge of a condition making performance impossible, there is no contract and no duties thereunder). Clearly, Dr. Krueger planned his project with the idea that he could circumvent or satisfy the restrictions. The trial court in *St. Clair* refused to enjoin the project. However, on the advice of counsel, Dr. Krueger delayed building while the action was pending, causing him to miss the construction deadline.

A central fact in this analysis is that Dr. Krueger knew of the restrictions on the property when he entered into the contract, but there was no evidence presented that the Hospital knew of the restrictions. Also, the Supreme Court held that Dr. Krueger's proposed building was 24,950 square feet and the required number of parking spaces had not been provided for on site. The agreement in the instant appeal states that the building "will have a minimum interior floor area of 18,000 square feet." There was no evidence presented in the instant action to establish that the minimum size of the building described in the contract equalled the size of the building designed for Dr. Krueger and which was finally subject to litigation in the *St. Clair* case. There was no evidence presented that the number of parking spaces required for an 18,000 square-foot building would have violated the restrictive covenant. We find that impossibility of the contract was not proved.

### (7) Post–Trial Motions

The court ruled that claims of violation of anti-trust laws, impossibility of performance because of restrictive covenants, and that the Hospital had mitigated its damages by purchasing the Kruegers' land at auction would not be considered. These claims were raised by counsel in a motion to augment the Kruegers' *pro se* motion for reconsideration of the court's findings of facts and conclusions of law. The court denied the motion to augment, stating that "regardless of whether the motion was filed pursuant to Rule 52, Rule 59, or Rule 60," neither the Kruegers nor their attorney filed an affidavit explaining why the issues were not raised or could not have been raised in the pleadings at trial.

Denials of I.R.C.P. 52(b) motions will not be disturbed unless the findings of fact are clearly erroneous. *Johnson v. Edwards*, 113 Idaho 660, 661–2, 747 P.2d 69, 70–71 (1987). An abuse of discretion standard applies to denials of motions for new trials under Rule 59 and to motions for further relief under 60(b). *Ortiz v. State, Dept. of Health and Welfare, su-*

*pra,* 113 Idaho at 685, 747 P.2d at 93; *Schraufnagel v. Quinowski,* 113 Idaho 753, 754, 747 P.2d 775, 776 (Ct.App.1987). Here, we have determined that the court's findings of fact are supported by the evidence; we find further that the court did not abuse its discretion in denying the motion.

■ The Kruegers' attorney suggested that the issues were not raised because of the Kruegers' lack of legal training. The court found this argument unpersuasive, stated that the Kruegers were "articulate, intelligent, educated and sophisticated business people," and held that "persons representing themselves in litigation are held to the same standards as persons represented by attorneys." *State v. Sima,* 98 Idaho 643, 644, 570 P.2d 1333, 1334 (1977). This conclusion is supported by the record. The Kruegers capably followed procedural rules, engaged in extensive discovery, and proceeded at trial. The court, aware of the Kruegers' lack of legal sophistication, granted them significant latitude throughout the proceedings. We find no error. Further, because the issues of anti-trust violations and mitigation were not raised at trial, we will not entertain them on appeal. *State ex rel. Evans v. Click,* 102 Idaho 443, 449, 631 P.2d 614, 620 (1981).

On appeal, the Kruegers also argue that the note was not supported by consideration, that public policy should not support the actions of the Hospital, and that the language of the contract regarding automatic termination means the Hospital cannot collect its money. These issues were also not raised at trial and will not be considered on appeal. *Id.*

### (8) Disqualification

■ The Kruegers assert that the court should have disqualified itself at the outset of the trial. When trial opened, District Judge Carey told counsel for the Hospital and Dr. Krueger that the judge's wife worked at the Hospital and asked if that relationship would concern the parties. Counsel and Dr. Krueger responded that they had no objection to the judge's continued involvement in the case. The Kruegers may not object on appeal to a procedure they agreed to at trial. *Brookbush v. Hatch,* 81 Idaho 228, 339 P.2d 986 (1959).

### Attorney Fees on Appeal

■ Both parties have requested an award of attorney fees for representation on this appeal. The Kruegers have not prevailed and their request is denied. The Hospital is the prevailing party and, we conclude, is entitled to recover a reasonable fee for the services of its attorney, upon two bases. First, the terms of the promissory note in issue provide that—in the event of default in payment of the note— the Kruegers agree to pay all costs incurred in collecting the sums due, including attorney fees on appeal. *See Pocatello R.R. Employees Fed. Credit Union v. Galloway,* 117 Idaho 739, 791 P.2d 1318 (Ct. App.1990). Second, this appeal merely has presented an invitation to second-guess the trial court on conflicting evidence and to consider issues which were not raised below. Under these circumstances an award of attorney fees on appeal is appropriate. I.C. § 12–121. *See Sun Valley Shamrock Resources, Inc. et al. v. Travelers Leasing Corp.,* 118 Idaho 116, 794 P.2d 1389 (1990).

### Conclusion

The trial court's findings of facts and conclusions of law are supported by substantial evidence. The Kruegers, represented by counsel, entered into a contract to construct a building. They missed the deadline for construction, agreed to terminate the contract and repay the advance given them by the Hospital. Their failure to repay the money allowed the Hospital to enforce the terms of the agreement to repay. The Kruegers failed to prove their affirmative defenses to enforcement of the agreement. The judgment of the trial court is affirmed. Costs and fees on appeal to respondent. I.A.R. 40, 41.

WESTON, J., pro tem., concurs.

SILAK, J., sat but did not participate in the opinion.