*133 J. JONES, Justice,
concurring in part and dissenting in part.
I dissent from Part II.A of the Court’s opinion, particularly from the conclusion that the Plaintiffs did not effectively raise the nondisclosure aspect of their fraud claim on appeal. Not only did the Plaintiffs effectively raise the issue on appeal, they established a right to relief on that ground. I dissent with respect to Part II.B and Part III. Although I dissent from the Court’s conclusion that the Plaintiffs did not raise the issue of nondisclosure in their appeal and believe the given jury instruction on the issue was inadequate, I concur with the result reached by the Court in Part IV, regarding the Plaintiffs’ claim of error with respect to the jury instruction on the nondisclosure issue. I concur in Part V of the opinion. I dissent from the Court’s holding in Part VI that Defendants are entitled to an attorney fee award.
With regard to the issue of whether the Plaintiffs adequately addressed their nondisclosure claim, it certainly appears from their opening brief that the Plaintiffs were raising a fuss that the Defendants failed to disclose a very material fact — that the Children’s Center had not been making rental payments required under the lease — a transgression that went to the very heart of the transaction. While it can be said that the Plaintiffs intermixed their misrepresentation and nondisclosure claims, it cannot be said that the nondisclosure issue was not addressed in their opening brief. The brief intermingled the two varieties of misrepresentation, outlining first the false statements allegedly made to them and then highlighting the material facts that should have been disclosed to them but which were deliberately withheld.[5] It might have been more effective, both below and on appeal, to treat the two issues separately, but the Plaintiffs were not obligated to do so.
Fraud is fraud, and this Court has not previously drawn a clear distinction between fraud involving nondisclosure of a material fact and fraud involving an affirmative misrepresentation. The two are often interrelated. In G & M Farms v. Funk Irr. Co., 119 Idaho 514, 808 P.2d 851 (1991) the plaintifffappellant alleged intentional misrepresentation in its complaint. Id. at 518, 808 P.2d at 855. The district court granted summary judgment to the defendant/respondent, determining that the alleged misrepresentations did not support a fraud claim. Id. This Court reversed the summary judgment because the district court had failed to consider nondisclosure of a material fact as an intentional misrepresentation. Id. at 526, 808 P.2d at 863. We said:
In Tusch Enters. v. Coffin, 113 Idaho 37, 41, 740 P.2d 1022, 1026 (1987), this Court held that an intentional misrepresentation or fraud claim should not be analyzed only with reference to the [nine] elements recited in Faw v. Greenwood, 101 Idaho 387, [389,] 613 P.2d 1338 [,1340] (1980). We stated in Tusch that the facts of that ease fell within the category of misrepresentation on the basis of nondisclosure. 113 Idaho at 41-42, 740 P.2d at 1026-27.
Id. at 520, 808 P.2d at 857.
The plaintiff in Watts v. Krebs, 131 Idaho 616, 962 P.2d 387 (1998) alleged that she was fraudulently induced to enter into an agreement to partition real property based on the defendant’s failure to disclose that he had removed the timber from the property. Id. at 619, 962 P.2d at 390. The defendant claimed “that he had to make some affirmative allegation before [the plaintiff] had a right to rely on his nondisclosure and, because he made no such allegation, [the plaintiff] had no right to rely on his failure to disclose the fact of harvesting.” Id. at 620, 962 P.2d at 391. Nevertheless, we stated, “this case did not involve an allegation of fraud by nondis *134 closure; it involves a claim for intentional misrepresentation.” Id. The Court went on to note the holding in G & M Farms that fraud “may be established by silence where the defendant had a duty to speak” and that a duty to speak arises in situations “where information to be conveyed is not already in possession of the other party.” Id. The interrelationship between the two varieties of fraud is rather apparent.
The Watts Court then approvingly cited to St. Alphonsus Reg’l Med. Ctr., Inc. v. Krueger, 124 Idaho 501, 508, 861 P.2d 71, 78 (Ct.App.1992) to outline several instances where a duty to disclose may arise, including several pertinent to this case:
(b) disclosure would be necessary to prevent a partial or ambiguous statement of fact from becoming misleading; or (c) subsequent information has been acquired which a party knows will make a previous representation untrue or misleading; or (d) a party knows a false representation is about to be relied upon; or (e) a party knows the opposing party is about to enter into the transaction under a mistake of fact and because of ... objective circumstances would reasonably expect a disclosure of the facts.
131 Idaho at 620, 962 P.2d at 391.
Although this is primarily a nondisclosure case, it also involves misrepresentations.[6] The principal misrepresentation made by High Mark — the assertion contained in the lease estoppel certificate (Estoppel Certificate) that all rent had been paid and was current — placed a heightened duty on High Mark to disclose what it never did disclose— that the Children’s Center had failed to make numerous rent payments. The Defendants not only withheld this critical information, they appear to have made every effort to conceal it.
Thomas O’Shea became interested in purchasing the property based upon the real estate listing, which stated, “[hjere is a great investment property with that hard to find 10 year, Triple Net Lease.” The listing stated that the “Scheduled Gross Income” and “Net Operating Income” was $299,850, annually, or $24,987.50, monthly.[7] It is obvious the property was being marketed as an income-producing property. The most reliable method for valuing such a property is the income approach “because that type of property is sold and purchased based upon actual income.” The Senator, Inc. v. Ada Co., Bd. of Equalization, 138 Idaho 566, 573, 67 P.3d 45, 52 (2003). A reliable stream of income is necessary in order to support the value of a property under the income approach appraisal method. Thus, the existence of the lease was the heart of the $3,700,000 purchase price. Without the income stream, the value of the property would take a nosedive.
During discussions about the property, High Mark’s broker, Paul Fife, was advised by Gordon Arave that the Children’s Center “had always paid rent on time and he hadn’t had any real problems” with the Center. Fife passed that information on to Jeff Needs, O’Shea’s broker.[8] At no time during *135 the course of the transaction did High Mark or any of its principals, agents or representatives advise any of the Plaintiffs that rent was not being paid or that the Children’s Center had given two promissory notes in lieu of rent. The impression that rent was being paid and was current was reinforced by a fax from High Mark’s broker to O’Shea’s broker containing information of “Rent Received from 6/2006 through 7/2007 ... $324,836.00” and by the Estoppel Certificate, which unequivocally stated that the $24,987.50 monthly rent was current, as well as any taxes, utilities or any other charges required under the lease, and that no default or any condition that could result in default currently existed. High Mark attempts to sidestep responsibility for these false representations, asserting in its brief that it did not contribute to the drafting of the several versions of the Estoppel Certificate “as they related to the payment of rents.”[9] What High Mark overlooks is that it was not the tenant’s obligation under the real estate contract to furnish the certificate. Rather, it was specifically agreed that High Mark would furnish the certificate and High Mark had an absolute obligation to ensure that the representations were correct. High Mark knew at the time the certificate was furnished that much of the rent had not been paid, that this information was very material to the transaction, and that this information was not disclosed to the Plaintiffs.[10]
A promissory note, dated April 18, 2007, payable by the Children’s Center to Gordon and Jared Arave, was unquestionably given in lieu of payment of $149,925 in rent that was owing for six months (August 2006— January 2007). Had the note been made payable directly to High Mark, this fact might have been more apparent. The note may have been written to the Araves to disguise the fact that rent was not being paid. The timing of the note is also of interest. The note represented six months of delinquent rent, going back as far as August 2006. Apparently, it did not occur to anyone to prepare a note until three months after the January payment became delinquent and just before the property was put on the market. A month and a half after the date of the note, the real property was listed for sale. After the real estate contract was signed, the Araves, with the concurrence of High Mark, agreed to cancel the note, on the condition that the Children’s Center sign the Estoppel Certificate, which unequivocally stated that all rent had been paid. High Mark and the Children’s Center entered into an agreement on October 18, 2007, to cancel the note in consideration for Children’s Center’s agreement to “immediately sign the estoppel certificate.” The agreement was made specifically contingent upon the closing of the sale to the Plaintiffs. Rather than being told that the note was canceled as an inducement for the Children’s Center to sign the false certificate, Defendants represented to the Plaintiffs that the cancellation of the note was in consideration of the Children’s Center dropping its option to purchase the property. The Defendants well knew that the option to purchase was essentially worthless because they knew the Children’s Center was in precarious financial condition and had *136 questionable prospects for improving that condition. Again, Defendants absolutely failed to disclose to Plaintiffs that the Children’s Center had not made those rent payments. When asked at trial whether he had ever told the O’Sheas about the existence of the April 18 note, Gordon Arave replied, “Never crossed my mind not one single time. Never thought about it.”
After the Estoppel Certificate was signed on October 18, 2007, the Children’s Center defaulted in payment of rent for October and November. Three days prior to that, the Children’s Center’s lawyer advised Scott Williams, a High Mark representative, that “We [Children’s Center] are unable to pay High Mark today, and we will advise when those monies may be available.” In the same time frame, the attorney and a Children’s Center representative met with Williams and both “indicated to him that The Children’s Center was having some severe financial difficulties and that we were not going to be able to make the [rent] payment and that we actually had a consultation with a bankruptcy attorney previously a couple of times and that it was very likely that the company would be headed towards bankruptcy.” On November 7, High Mark’s counsel emailed the Children’s Center’s counsel to inquire about rent payment and to suggest that the two defaulted months be paid by virtue of a promissory note made payable to High Mark. The rent deferral note, dated November 7, 2007, was thereupon signed by the Children’s Center. None of this was ever disclosed to the Plaintiffs.
The district court and the parties seem to have gotten overly concerned about the Estoppel Certificate and whether or not it was the principal source of information upon which the Plaintiffs relied to conclude the purchase. In its attempt to downplay the significance of the certificate, the Defendants, perhaps inadvertently, highlighted in their brief what was really important. They stated:
[Jeff] Needs [Plaintiffs’ realtor] testified during cross examination he “relied mostly on the lease” and “on the fact that the tenant we had been told was a strong tenant, had been paying every monthly rent on time, in a timely manner, had been a great tenant,” in purchasing the property. Needs did not include the estoppel certificate in this list of what he, and by imputation, the buyers relied on for purchasing the property.[11]
(Emphasis in original.) The value of the property was clearly dependent upon the existence of the ten-year, $24,987.50-per-month lease. The Plaintiffs were relying on that strength in acquiring the property. The Estoppel Certificate played a supporting role in reinforcing their belief that the property was worth what it was priced at, but it was not the only factor.
In January of 2008, a month after the closing, the Plaintiffs received word that the Children’s Center could not pay its rent and that it would be vacating the property. Plaintiffs never received any rent from the Children’s Center.[12]
*137 The sum and substance of this ease is that rent on the Children’s Center was not being paid, that the Defendants appear to have taken pains to disguise such fact and keep it from becoming known to the Plaintiffs, and that the Plaintiffs obviously suffered substantial damages. It is no wonder that the Plaintiffs testified at trial that they would not have decided to purchase the property if they had known about the nonpayment of rent. O’Shea testified, “There is no way that we would have gone ahead with that deal had we known [the Children’s Center had not paid rent for October, November and December of 2007].” This almost goes without saying.
All of the foregoing facts were presented in the Plaintiffs’ opening brief, although not, perhaps, organized in the optimum order. At one point, after referencing the Children’s Center balance sheet, the promissory note forgiven in exchange for the Estoppel Certificate, and the Children’s Center’s tax returns and profit and loss statement, Plaintiffs state:
None of these documents “disclose[d] the inaccuracy of the representation^]” that the Center had regularly paid its rent and was current. First, the August 28, 2007 balance sheet showed no more than that the Center owed a debt to Gordon and Jared Arave, but did not disclose that the debt was for unpaid rent. Second, Fife’s statement to Needs did not disclose that rent had not been paid by the Center, or that the promissory note was for unpaid rent. Fife did not even know this fact. Third, the tax returns and profit and loss statement did not disclose that the Lease had been modified or that all monthly rent had not been paid. No other evidence was presented which “diselose[d] the inaccuracy of the representation^]” made by High Mark.
Likewise with respect to the allegations of actual fraud or fraud by nondisclosure, the District Court’s failure to look at the evidence again affected its decision. The elements of materiality, knowledge of falsity, justifiable reliance, and resultant injury are all connected to whether or not the information made available to the Appellants actually disclosed the inaccuracy of the representations. A proper review of the documents by the District Court ... would have revealed that the misrepresentations had not been disclosed.
The above wording is somewhat awkward, but it does address the fact that the Defendants failed to disclose the critical fact that rent was not being paid by the Children’s Center. The Plaintiffs then say, “The verdict in favor of the Respondent High Mark Development, LLC, on the issues of breach of contract, fraud and fraud by nondisclosure, and against Gordon Arave on the issue of fraud by nondisclosure was not supported by substantial evidence and the District Court did not make the required inquiry into the matter.” Further on, the Plaintiffs say, “the Court should have found Respondents High Mark and Gordon Arave liable for their fraudulent statements and failure to disclose the truth to the Appellants.” They later state, “[a]t summary judgment, the District Court erred in its analysis of fraud by nondisclosure by failing to look at every circumstance under which a duty to disclose exists,” and that:
High Mark had an affirmative duty to disclose the existence of promissory notes which materially altered the rent payment responsibilities of the Center, as stated in the Lease Agreement. These included not only the April 18, 2007 promissory note, but also the November 7, 2007 promissory note, signed after the Estoppel Certificate had been provided to Appellants. This “subsequent information” made High Mark’s previous representation “untrue or misleading.” High Mark also had a duty to disclose that “all minimum monthly rent” had in fact not been paid, in order “to prevent a partial or ambiguous statement of fact from becoming misleading.” As previously stated, this “information ... *138 [was] not already in possession of the other party.” High Mark knew, or should have known, that the false statements made in the Estoppel Certificate were “about to be relied upon,” as the Certificate itself stated, “This certification is made with the knowledge that it will be relied upon by Purchaser ... in connection with financing and sales of the Property and the purchase of the Property by Purchaser.” Due to these “objective circumstances,” High Mark knew, or should have known, that the Appellants “would reasonably expect a disclosure of the facts.”
Then, Plaintiffs devote almost three pages of their brief to a discussion of the elements of fraudulent nondisclosure, the duty to disclose, and why they believe the instruction given by the district court on this issue was inadequate under the circumstances of their case. Thus, it certainly appears that the Plaintiffs adequately raised the nondisclosure issue to the extent that it must be addressed by this Court.
The Defendants worked hard at trial to deflect attention from their failure to advise Plaintiffs of the important fact that the Children’s Center had not paid rent to High Mark for August through December of 2006, or for the months of January, October and November of 2007, or that two promissory notes had been issued by the Children’s Center in lieu of rent, or that the Children’s Center had been induced to sign the false Estoppel Certificate in exchange for cancellation of the first rent-related note. Instead, the Defendants contend that the Plaintiffs received adequate information about the precarious financial condition of the Children’s Center and that they should have been on notice that they could not count on receiving rental payments under the lease. However, when asked during oral argument before this Court why the Defendants had not advised Plaintiffs that the lessee was a deadbeat, Defendants’ counsel pushed back, stating, in effect, that it was not a deadbeat, and that the Children’s Center had made some rental payments, was consolidating its operations in the leased premises, growing its business, and ramping up operations. Counsel made this assertion twice during oral argument. In their brief, Defendants assert that “the rent concessions and resulting promissory notes were used to assist the Center in ramping up its operations or to assist it with cash flow,” that the Center “was still growing its business at the [property] and had high expenses in 2006 as a result of growing its business,” and that the Plaintiffs “clearly had this information.” The Defendants can’t have it both ways. Either the Children’s Center was in such precarious financial difficulty that it likely could not pay rent or the business was merely experiencing growing pains and had no cause for concern. What is clear is that the Plaintiffs were never told about the nonpayment of rent. Indeed, in his closing argument to the jury, Defendants’ counsel stated, “[Gordon] Arave did not feel it was important — or High Mark did not feel it was important to disclose to the buyers that rent had not been paid in October and November. Why? It’s because the Children’s Center had told High Mark on multiple occasions that they were centralizing their operations in Idaho Falls.” Perhaps it might have been appropriate to inform the Plaintiffs of the non-payment of rent and let them judge whether or not it was important to know of this critical defalcation.
Turning to the district court’s decision on the Defendants’ motion for JNOV or new trial, there are simply too many infirmities to justify affirmance. The manner in which the district court reached its conclusion and the evidence relied upon by the court in reaching the conclusion are troublesome.
On the issue of process, the district court did state the standards applicable to both JNOV and new trial. However, the analysis of the breach of contract issue mixed the two together, disregarding this Court’s directive in Quick v. Crane, 111 Idaho 759, 767, 727 P.2d 1187, 1195 (1986), that “it is essential that if an alternative motion for a new trial is made with the motion for judgment n.o.v., the trial court must rule on both motions separately.” Here, the district court referred to some evidence it thought might justify the jury verdict, observed that the court “may not necessarily agree with the jury verdict,” and then concluded that “Plaintiffs are not entitled to JNOV or new trial on *139 their breach of contract claim.” This is not the type of analysis envisioned by the Court in Quick v. Crane.
Furthermore, several of the Court’s findings were incorrect. The court incorrectly stated that the Defendants “put on evidence showing that they informed Plaintiffs prior to closing of the existence and purpose of the promissory notes,” because, although the April 18, 2007 note was disclosed, the November 7, 2007 note was not, and there is no evidence in the record that the true purpose of either note was ever disclosed to Plaintiffs. Nor was the district court entirely correct in stating, “Fife also testified that he told Needs that a promissory note had been forgiven in exchange for the Center signing the Estoppel and releasing the Option.” Fife did not know what the promissory note was for and was not aware that it was for nonpayment of rent or rent deferral.
The district court makes several references to the fact that the Plaintiffs had been given access to documents showing that the Children’s Center was in precarious financial condition. That may be true but, as indicated above, the evidence was conflicting as to whether the financial stress was severe enough to impact the Children’s Center’s ability to continue paying rent. What was never disclosed to the Plaintiffs, more importantly, is that the Children’s Center had failed to pay numerous monthly rental payments and that two promissory notes had been given in lieu of eight month’s rent. The true purpose of those notes was never disclosed to the Plaintiffs. Financial statements, tax returns, and other types of financial documents can be subject to manipulation and varying interpretations. The fact that rent is not being paid is a fairly clear-cut fact that cannot necessarily be manipulated, although, as shown here, it can be disguised. This real estate was being sold as income-producing property, it was purchased as income-producing property, and the value of the property was based on the ability of the property to produce income, but the income, i.e. the rent, was simply not being paid and received.
The district court speculates that the Defendants may have pursued the purchase despite the unfavorable financial condition of the Children’s Center because of the potential benefits of a tax-deferred, like-kind exchange under 26 U.S.C. § 1031.[13] However, any evidence in this regard was equivocal in nature and it appeared during oral argument before this Court that counsel for neither party seemed to have a clear understanding of the requirements of such an exchange. What we do know for certain is that there was no disclosure by Defendants that eight months of rent had not actually been paid, as required by the lease, and that the Plaintiffs unequivocally stated that they would not have proceeded with the purchase if this fact had been disclosed. The Plaintiffs were never given the opportunity to take this important fact into account in making their decision as to whether to close the transaction. This case has similarity to Watts v. Krebs where we said, “a reasonable person under the circumstances would find the existence or nonexistence of standing timber with a worth in excess of $28,000 on rural property an important fact in determining whether to enter into an agreement to acquire the property.” 131 Idaho at 620, 962 P.2d at 391. Here, any reasonable buyer would want to know, before concluding the purchase, whether property being sold and purchased as income-producing property was actually producing the income represented. Even viewing the evidence in the record in the light most favorable to the Defendants, I can only conclude that the trial court erred in failing to grant the JNOV motion.[14] The failure of the jury to award damages is virtually inexplicable.
After devoting about four pages of its decision to analysis of the breach of contract claim, the court dispatched both the misrepresentation and nondisclosure claims in *140 somewhat less than one page, each. As with the contract claim, the district court failed to separately consider the JNOV motion and the new trial motion for the fraud claims, conglomerating them together. With regard to the new trial motion, the record does not disclose that the district court weighed the evidence and determined “(1) whether the verdict is against his ... view of the clear weight of the evidence; and (2) whether a new trial would produce a different result.” Schwan’s Sales Enters., Inc. v. Idaho Transp. Dept., 142 Idaho 826, 833, 136 P.3d 297, 304 (2006). The court did not disclose the evidence it considered in reaching its conclusions and, unlike with the breach of contract claim — where it stated, “[w]hile the Court may not necessarily agree with the jury verdict, the Court does not have a ‘definite and firm conviction’ that a mistake has been made” — it made no such observation with respect to either of the fraud claims. Since the elements of the fraud claims differ substantially from the elements of a breach of contract claim, one cannot necessarily import the required analysis for a contract claim into a fraud claim. The court was required to analyze the different types of claims, separately, considering the different elements involved.
The district court’s analysis of the nondisclosure issue is somewhat confusing. It mistakenly characterizes the claim as a “constructive fraud” claim. Constructive fraud occurs when a party to a relationship of trust and confidence breaches a fiduciary duty. Gray v. Tri-Way Const. Services, Inc., 147 Idaho 378, 386, 210 P.3d 63, 71 (2009). There is no claim of a fiduciary relationship in this case. The court then cites Watts v. Krebs foian eight-element cause of action, whereas Watts v. Krebs states the requirements of a fraud claim as: “That there was nondisclosure, that [Watts] relied upon Krebs’ nondisclosure, that [Watts’] reliance was material to the transaction, and that [Watts] was damaged as a proximate result of the nondisclosure.” 131 Idaho at 619, 962 P.2d at 390.
The district court then does a nine-line analysis, stating that the promissory notes were disclosed,[15] that other documents showed the Children’s Center’s financial problems and that the jury could have concluded that the undisclosed information was not so vital that it should have been timely disclosed. The district court completely missed the point. How can it be said that the nonpayment of rent was not so vital that it need not have been disclosed? The court then found that substantial evidence supported the jury’s decision. While that conclusion, if correct, might be sufficient to uphold denial of a motion for JNOV, it is not sufficient, in and of itself, to support the denial of a motion for a new trial. As we stated in Quick v. Crane, “the trial judge may set aside the verdict even though there is substantial evidence to support it.” Ill Idaho at 767, 727 P.2d at 1195.
The district court’s analysis of the misrepresentation claim is even more perfunctory, it is eonelusory, and it is defective. After stating the elements of a fraud claim, the court devotes a total of six lines of analysis to the Plaintiffs’ fraud claim. According to the district court, “Defendants presented evidence at trial wherefrom the jury could reasonably conclude that the false statements were not material,[16] that Plaintiffs knew about the fal *141 sity of the statements, that Plaintiffs did not rely on the false statements, that any reliance was not justifiable, or that there was no resultant injury.” Again, the court found the decision “was supported by substantial evidence,” and therefore held that Plaintiffs are not entitled to JNOV or a new trial. With regard to both fraud claims, the court clearly erred in finding that the Defendants had disclosed both promissory notes to the Plaintiffs.[17]
It can hardly be said that the trial court carried out his responsibilities with regard to either the motion for JNOV or the motion for a new trial, a situation this Court can correct on appeal. With regard to the JNOV, “the parties are entitled to full review by the appellate court without special deference to the views of the trial court.” Quick v. Crane, 111 Idaho at 764, 727 P.2d at 1192. In my view, the record does not contain evidence to support the jury’s verdict on the nondisclosure claim. Nor does it appear, for purposes of the new trial motion, that the district judge “has actually given due consideration to the facts and circumstances of the case, and correctly applied the law thereto.” Id. at 772, 727 P.2d at 1200. Furthermore, the district court failed to “distinguish between the various motions and the grounds upon which they are based,” and “simply lump[ed] them all together and issue[d] a general grant or denial.” Id. at 773, 727 P.2d at 1201.
While the Plaintiffs may not have acted in an exemplary manner in this case, there is no ground to excuse the fraud perpetrated against them.[18] It is clear that the Plaintiffs could have exercised more diligence in determining the financial strength of the Children’s Center,[19] in presenting their case to the jury, and in articulating their case on appeal. O’Shea’s testimony regarding the financial documents was somewhat shaky and inconsistent in places, which may have caused the jury to lose some confidence in him. However, the infirmities in his testimony dealt with peripheral issues, such as when he received this or that document, the particulars of the 1031 exchange possibility, and the like. They did not address the critical issues — was the Children’s Center really paying its rent, had High Mark actually received $324,836 as rental for the property from June 2006 through July 2007, what was the real purpose of the April 18 promissory note, and had the Children’s Center failed to pay rent following execution of the Estoppel Certificate? It cannot be contended by the Defendants that they disclosed information *142 critical to the value of the property — the income stream being received by High Mark from the Children’s Center. When one is selling income-producing property to a buyer wanting that kind of property, it is critical that the seller disclose that rent is not being paid as required by the lease, and it is more important that the buyer not take steps to conceal this critical fact. I simply cannot find that incautiousness on the part of the Plaintiffs overrules the obvious fraudulent design of the Defendants in this matter.
The district court failed to carry out its responsibilities in analyzing the Plaintiffs’ claims, either under a JNOV standard or a new trial standard. Thus, I would reverse and, at a minimum, remand the case for a new trial.
Justice W. JONES concurs.

. Plaintiffs’ argument on appeal essentially mirrored their argument to the jury in this regard. In their closing argument the Plaintiffs first told the jury of false statements that were made to them and then immediately turned to matters of nondisclosure. Their counsel argued:
Now I want to talk about the nondisclosure part of this because, you’ll recall, the Court has instructed us that one of the claims we seek is fraud by silence, by nondisclosure, not only what did you tell us that was untrue that we relied on and had a right to rely on but what was material, what was material to the transaction, that wasn’t disclosed.

. In their amended complaint, the Plaintiffs allege about an equal mix of false statements and material nondisclosures in the third count, titled "Negligent and/or fraudulent misrepresentation.” They focus on the representation that the Children’s Center lease was in good standing and the failure of Defendants to inform them that many rental payments had not, indeed, been made or had been made by way of promissory notes, the purpose of which was not disclosed.

. In ruling on the Plaintiffs’ motion for summary judgment, the district court said that language in the listing could not be used to support a claim for fraud because the language was "sales talk or puffing.” The district court was incorrect in that regard, but the ruling has no real bearing on the nondisclosure claim. See G & M Farms, 119 Idaho at 522, 808 P.2d at 859 (The general rule that seller’s talk or puffing do not amount to actionable misrepresentation "is not applicable where the parties to the transaction do not ... have equal means of knowing the truth”). The relevance of the listing is that it helps to set the predicate for the nondisclosure claim — the fact that the property was being sold upon the strength of the lease, a fact that was fairly obvious throughout the transaction.

.In its ruling on Plaintiffs’ motion for summary judgment, the district court indicated that when the information was passed from High Mark’s broker to O’Shea’s broker, it may have been qualified by the statement that "as far as he knew” the rent was being paid. Again, this is not particularly relevant to the nondisclosure claim. A number of documents purported to show that rent was being or had been paid.

. Defendants’ counsel fails to note that, although he did not draft the initial version of the Estoppel Certificate, he did draft a subsequent version of the certificate, which did contain all of the representations regarding the payment of rents. Counsel disingenuously told the jury, "We weren’t responsible for misrepresentations in the estoppel certificate," and “The tenant was the real party here who misrepresented facts, not my clients.” This, despite the fact that the district court, in its summary judgment ruling, stated, "To the extent a contact requires one party to provide information to the other party in anticipation of completing the agreement, it is at least implicit in the agreement that the information will be accurate and reliable,” referring to the rental and default representations in the Estoppel Certificate.

. The Estoppel Certificate is dated October 17, 2007. At that time the October rental payment was due and had not been paid. On November 7, 2007, Defendants’ counsel drafted another promissory note, this one in the principal amount of $57,975, representing rental due for October and November of 2007. This was apparently for the purpose of deferring rent until the transaction was closed in December 2007. This note was never disclosed to the Plaintiffs. At trial, when asked if the November promissory note should have been disclosed, Gordon Arave testified, "When I looked back at that situation, that is perhaps correct. At that time it was not preeminent in my mind at all.”

. High Mark’s counsel made a similar statement to the jury in attempting to absolve Gordon and Scott Arave from liability, saying:
Let's turn to the question of what the buyers actually relied on in this case. And I think the best testimony was from Jeff Needs [O’Shea’s realtor] as to what was relied on. Remember the questions that I asked Mr. Needs? I asked him "What was it that you mostly relied on in this case — rely on in this case?” And he testified that it was the lease agreement. And then he said, well, it also included statements that were made to him and to Tom O’Shea by Paul Fife [High Mark’s broker].
Counsel’s assertion that the Plaintiffs did not rely on the Estoppel Certificate is not supported by the record or by the fact that Needs did not specifically reference it in his testimony. The certificate itself stated, "This certification is made with the knowledge that it will be relied upon by Purchaser, Purchaser's lender and any successor or assignee of Purchaser’s right to purchase the Property____’’ The Estoppel Certificate was important in another regard because Addendum Í to the real estate contract provided, "Should the information provided on the estoppel differ from the information provided by Seller, Buyer shall have the option to terminate the Agreement and receive full refund of Earnest Money.” In other words, the Plaintiffs had an out, in the event that information in the certificate was false. Unfortunately, the Defendants did not provide the buyer the critical information that would have disclosed the falsity of the representations regarding rental and allowed the buyer to terminate the transaction.

. Although it does not appear in the trial record, in its decision on the Plaintiffs’ motion for summary judgment, the district court noted:
*137 On October 3, 2008, Plaintiffs’ counsel wrote a letter to Defendants offering to tender the Property back to Defendants in an attempt to rescind the purchase of the Property and return the Parties to their pre-contract positions. Defendants refused to rescind the purchase of the Property.
The Plaintiffs thereafter filed this suit seeking damages.

. However, the district judge was aware that Plaintiffs had sought rescission of the contract ten months after closing, which would have deprived them of the benefit of the section 1031 tax deferral.

. Although one might ponder whether a claim for breach of the covenant of good faith and fair dealing is the appropriate mechanism for redress under the facts of this case, that issue was not brought to the Court on cross appeal.

. Again, the April 18, 2007 note was disclosed, but the purpose of that note was certainly not. There was never any disclosure to Defendants that the note was given in lieu of rent, a fact that Defendants’ counsel acknowledged in his closing argument. He flatly stated that Gordon Arave talked to Paul Fife about the note but "he didn’t tell him it was for rent deferral." It must be kept in mind that the income stream for income-producing property is critical to establish and maintain its value. There was no discussion of the fact that the fax from Paul Fife to Jeff Needs showed rent had been received for the property from 6/2006 through 7/2007 in the sum of $324,836; nor that the Araves had canceled the April 18, 2007 promissoiy note as an inducement to obtain the Children’s Center’s signature on the false Estoppel Certificate; nor that rent was not paid in the two months leading up to closing but, rather, put on to the November 7, 2007 promissory note, which was never disclosed.

. This conclusion seems to be at odds with the district court’s ruling on summary judgment, wherein it found the statements in the Estoppel Certificate indicating that rent was current were "false” and that ”[r]ent owed to High Mark in fact remained unpaid.” The very premise of the contract claim was that these representations were material to the contract and they could not have been any less material to a claim of fraud.

. The analysis of the fraud claims was complicated by the nature of the special verdict form. The two fraud questions stated:
Question No. 2: Did High Mark Development commit fraud, which was a proximate cause of damages to Plaintiffs?
Answer: Yes_No_
Question No. 3: Did High Mark Development commit fraud by nondisclosure, which was a proximate cause of damages to Plaintiffs? Answer: Yes_No_
It is impossible to tell from these compound questions whether the jury might have concluded that High Mark did or did not commit fraud or, if it did, whether fraud was a proximate cause of damages. Because of the multiple possibilities, the district court should have devoted more than a total of 15 lines to analyzing both fraud claims under both motions.

. Nor can the fraud be excused or mitigated by virtue of the Children’s Center’s undisclosed problems with the Board of Medicine or Medicaid cutbacks.

. Even though the Plaintiffs could have exercised more diligence in determining the financial condition of the Children’s Center, they were not obligated to do so. As the Court noted in Watts v. Krebs, citing Sorenson v. Adams, 98 Idaho 708, 571 P.2d 769 (1977), the "purchasers’ failure to investigate a misstatement of tillable acreage made in a document given to them by the vendor did not negate their right to rely on the misstatement.” 131 Idaho at 621, 962 P.2d at 392. The Court continued:
In noting that "silence, in circumstances where a prospective purchaser might be led to harmful conclusions, is a form ‘representation,’ ” the Court concluded that the vendor’s failure to say anything when he gave the purchasers the document containing the misstatement of tillable acreage amounted to a misrepresentation. The fact that the purchasers could have checked the accuracy of the figures by visiting the tax assessor's office, did not negate the purchasers’ right to rely on the figures.
Id. Here, the Plaintiffs had the right to rely on the representations made in the Estoppel Certificate and other documents, which purported to show the rent had been paid and was current. No warning or disclosure was provided in any of these documents, indicating that promissory notes had been issued in lieu of rental payments.